# KENNETH CLARK *v.* COMMISSIONER
# OF CORRECTION
# (SC 17434)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued February 15, 2006—officially released February 20, 2007

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellant (respondent).

*Kent Drager*, senior assistant public defender, for the appellee (petitioner).

*Richard Blumenthal*, attorney general, and *Robert F. Vacchelli*, assistant attorney general, filed a brief for the office of the attorney general as amicus curiae.

*Opinion*

PALMER, J. Under the Uniform Criminal Extradition Act (act), General Statutes § 54-157 et seq., the governor of this state has a mandatory duty to comply with a demand by the executive authority of another state for the extradition of a person who, having been charged with a crime in the demanding state, is a fugitive from justice and is found in this state. By contrast, the governor of this state has discretion to comply with a demand for the extradition of a person who, although found in this state, is not deemed to be a fugitive from justice under the act. The sole issue raised by this certified appeal is whether the Appellate Court properly concluded that the petitioner, Kenneth Clark, who was

charged with a crime in Texas and thereafter removed to this state under legal compulsion, is not subject to extradition to Texas under the mandatory provisions of the act because, having been removed from Texas involuntarily, he is not a fugitive from justice for purposes of the act. See *Clark* v. *Commissioner of Correction*, 88 Conn. App. 178, 192, 868 A.2d 798 (2005). We disagree with the conclusion of the Appellate Court and, therefore, reverse its judgment.

The opinion of the Appellate Court sets forth the following undisputed facts and procedural history. "In 1996, the petitioner had been extradited involuntarily from Texas to this state because of an outstanding parole violation. After having been returned to this state, the petitioner was incarcerated here until April, 2000.

"In pursuit of his request for extradition in the present case, the governor of Texas sent to our governor a written demand, dated April 17, 2003, for the extradition of the petitioner. See General Statutes § 54-157 et seq. In accordance with General Statutes § 54-159,[1] the extradition demand stated that the petitioner had been

---

[1] General Statutes § 54-159 provides: "No demand for the extradition of a person charged with crime in another state shall be recognized by the Governor unless in writing alleging, except in cases arising under section 54-162, that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter he fled from the state, and accompanied by a copy of an indictment found or by information supported by affidavit in the state having jurisdiction of the crime, or by a copy of an affidavit made before a magistrate there, together with a copy of any warrant which was issued thereupon; or by a copy of a judgment of conviction or of a sentence imposed in execution thereof, together with a statement by the executive authority of the demanding state that the person claimed has escaped from confinement or has broken the terms of his bail, probation or parole. The indictment, information or affidavit made before the magistrate must substantially charge the person demanded with having committed a crime under the law of that state; and the copy of indictment, information, affidavit, judgment of conviction or sentence must be authenticated by the executive authority making the demand."

charged with the commission of a crime in the state of Texas,[2] 'was present in [Texas] at the time of the commission of said crime,' 'thereafter fled from the justice of [Texas],' and had taken refuge in Connecticut. The extradition demand consistently referred to the petitioner as a 'fugitive.' In response, on April 29, 2003, our governor exercised his power, pursuant to General Statutes § 54-163,[3] to issue a warrant for the arrest of the petitioner. The petitioner was arrested on May 2, 2003.

"The petitioner's petition for a writ of habeas corpus to challenge his status as a fugitive was heard by the habeas court, *Hon. William L. Hadden, Jr.*, judge trial referee. [The habeas court] found that 'the extradition papers [were] in order in satisfaction of . . . § 54-159, that the petitioner has been identified as the individual the state of Texas seeks to extradite, [that] there is probable cause to believe he committed a crime in that state, and [that] he is a fugitive from justice.'[4] Accordingly, [the habeas court] dismissed the habeas petition and ordered the petitioner extradited to Texas." *Clark* v. *Commissioner of Correction*, supra, 88 Conn. App. 180–82.

---

[2] The petitioner has been charged in Texas with aggravated sexual assault of a child under fourteen years of age.

[3] General Statutes § 54-163 provides: "If the Governor decides that the demand should be complied with, he shall sign a warrant of arrest, which shall be sealed with the state seal, and be directed to any peace officer or other person whom he may think fit to entrust with the execution thereof. The warrant shall substantially recite the facts necessary to the validity of its issuance."

[4] The term "fugitive from justice" is used to describe a person who, having been charged with the commission of a crime in one state, has "fled from" that state to another state within the meaning of the act. General Statutes § 54-158; see, e.g., *Barrila* v. *Blake*, 190 Conn. 631, 634–35, 461 A.2d 1375 (1983); *Commonwealth ex rel. Bonomo* v. *Haas*, 428 Pa. 167, 170–72, 236 A.2d 810 (1968); see also *United States ex rel. Moulthrope* v. *Matus*, 218 F.2d 466, 468 (2d Cir. 1954) (noting that, for purposes of federal law, "the phrase 'fled into' . . . has been assimilated into the phrase 'fugitive from justice' ").

Thereafter, the petitioner appealed to the Appellate Court, claiming that, under General Statutes § 54-161,[5] a person who is removed involuntarily from the demanding state by government compulsion is not a fugitive, and, therefore, the extradition demand by Texas, which identified the petitioner as a fugitive, was invalid. Id., 183. In essence, the petitioner maintained that his designation as a fugitive by the Texas authorities misled our governor into believing that he had no discretion in deciding whether to extradite the petitioner, and that the extradition demand should have been made under § 54-161, which, according to the petitioner, vests the governor with discretion to comply with Texas' demand. See id., 183–84. The respondent, the commissioner of correction (commissioner), claimed that General Statutes §§ 54-158[6] and 54-159, not § 54-161, are the governing statutory provisions, and, therefore, our governor has a mandatory duty to comply with Texas' demand for the petitioner's extradition to that state. See id., 184. In support of that contention, the commissioner maintained that § 54-158 embodies

---

[5] General Statutes § 54-161 provides: "When it is desired to have returned to this state a person charged in this state with a crime, and such person is imprisoned or is held under criminal proceedings then pending against him in another state, the Governor of this state may agree with the executive authority of such other state for the extradition of such person before the conclusion of such proceedings or his term of sentence in such other state, upon condition that such person be returned to such other state at the expense of this state as soon as the prosecution in this state is terminated. The Governor of this state may also surrender on demand of the executive authority of any other state any person in this state who is charged in the manner provided in section 54-179 with having violated the laws of the state whose executive authority is making the demand, even though such person left the demanding state involuntarily."

[6] General Statutes § 54-158 provides: "Subject to the provisions of this chapter, the provisions of the Constitution of the United States controlling, and any and all acts of Congress enacted in pursuance thereof, it is the duty of the Governor of this state to have arrested and delivered up to the executive authority of any other state of the United States any person charged in that state with treason, felony or other crime, who has fled from justice and is found in this state."

the principle, adopted and applied by this court in *Moulthrope* v. *Matus*, 139 Conn. 272, 277–78, 93 A.2d 149 (1952), cert. denied, 345 U.S. 926, 73 S. Ct. 785, 97 L. Ed. 1357 (1953),[7] some five years prior to the passage of the act,[8] that a person is a fugitive from justice no matter why that person left the demanding state, even when he is removed from that state involuntarily by government compulsion, and, further, that the act did not purport to overrule that well established principle. See *Clark* v. *Commissioner of Correction*, supra, 88

---

[7] In *Moulthrope*, the petitioner, Watson Moulthrope, was convicted of robbery in this state and sentenced to a term of imprisonment. *Moulthrope* v. *Matus*, supra, 139 Conn. 274. While serving that sentence, Moulthrope escaped and fled to Florida, where he committed a murder. Id. Following his conviction in Florida for that crime but prior to the imposition of sentence, the governor of Connecticut "made requisition upon the governor of Florida" for Moulthrope's return to Connecticut to face charges stemming from his escape. Id. The governor of Florida issued a warrant for Moulthrope's extradition and delivered him to officers of this state, who returned him to Connecticut under compulsory process. Id. Thereafter, Moulthrope was convicted and sentenced to a term of imprisonment in Connecticut. Id. Upon Moulthrope's completion of that prison term, the governor of Florida "made requisition upon the governor of Connecticut for [Moulthrope's] return . . . [to Florida] as a fugitive from justice" from that state. Id., 274–75. The governor of Connecticut issued a warrant for Moulthrope's arrest and return to Florida; id., 275; which Moulthrope challenged by way of a habeas petition. See id., 273. The habeas court ultimately dismissed the petition, and Moulthrope appealed. Id.

On appeal, Moulthrope claimed, inter alia, that he was not a fugitive from justice because he had been removed from Florida forcibly under legal compulsion. Id., 275. Relying on extradition principles rooted in the United States constitution and in federal statutory law, we rejected Moulthrope's claim, explaining that "[o]ne need not necessarily have left the state for the purpose of avoiding arrest or prosecution to be a fugitive from justice. . . . It is enough if, after committing a crime in one jurisdiction, the perpetrator departs and is later found in another." (Citation omitted.) Id., 276. We further stated that to adopt the position that Moulthrope had advanced "would tend to defeat the purpose of extradition, which is to prevent state boundaries from providing those charged with crime with a means of asylum." Id., 277. We therefore agreed with the habeas court that, "[e]ven though [Moulthrope] was removed from Florida by legal process and against his will, he is [nonetheless] a fugitive from justice" subject to extradition. Id.

[8] This court issued its opinion in *Moulthrope* in 1952; the act was passed in 1957. See Public Acts 1957, No. 362.

Conn. App. 184. The commissioner further maintained that this interpretation of the act is buttressed by § 54-159, which requires that *all* demands for extradition, except those made for nonfugitives under General Statutes § 54-162,[9] shall allege, inter alia, that the person whose extradition is sought has "fled from" that state, thereby reflecting a legislative intent that all persons who commit a crime in the demanding state and thereafter are found in another state, including those persons who were removed involuntarily from the demanding state, shall be treated as fugitives subject to mandatory extradition.

The Appellate Court framed the issue before it as one requiring a determination of whether *Moulthrope* had been overruled by the act and, in particular, by § 54-161. Id. Relying on the language of General Statutes § 54-161, pursuant to which our governor "*may . . . surrender . . . any person in this state who is charged . . . with having violated the laws of* [another] *state . . . even though such person left the demanding state involuntarily*"; (emphasis added); and on the basis of its analysis of case law from other jurisdictions, the Appellate Court concluded that the act did, indeed, overrule *Moulthrope*, such that, under the act, the governor has discretion to extradite a person who had been removed from the demanding state by government compulsion. *Clark* v. *Commissioner of Correction*, supra, 88 Conn. App. 184–92. The Appellate Court further concluded that, because the petitioner had been returned

---

[9] General Statutes § 54-162 provides: "The Governor of this state may also surrender, on demand of the executive authority of any other state, any person in this state charged in such other state in the manner provided in section 54-159 with committing an act in this state, or in a third state, intentionally resulting in a crime in the state whose executive authority is making the demand, and the provisions of this chapter not otherwise inconsistent shall apply to such cases, even though the accused was not in that state at the time of the commission of the crime and has not fled therefrom."

to Connecticut from Texas involuntarily by compulsory process, the petitioner was a nonfugitive, and, consequently, Texas' extradition demand describing the petitioner as a fugitive was void.[10] Id., 192. We granted the commissioner's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly determine that the extradition warrant in the present case was void and that the extradition was governed by . . . § 54-161?" *Clark* v. *Commissioner of Correction*, 273 Conn. 940, 875 A.2d 42 (2005).

On appeal to this court, the commissioner claims that the Appellate Court incorrectly concluded that the petitioner is not a fugitive from justice subject to mandatory extradition pursuant to § 54-158. Specifically, the commissioner contends that, in light of the purpose of the drafters of the Uniform Criminal Extradition Act (uniform act), on which our act is modeled,[11] and the great weight of authority from other states, our legislature, in passing the act, did not intend to overrule this court's holding in *Moulthrope* that a person is a fugitive from justice, and therefore subject to mandatory extradition under § 54-158, even though that person departed the demanding state involuntarily under legal compulsion. The commissioner further contends that the Appellate Court incorrectly concluded that the legislature had intended to overrule *Moulthrope* because our holding in that case was predicated on principles embodied in the extradition clause of the United States

---

[10] We note that, following the decision of the Appellate Court, Texas submitted new extradition papers requesting the issuance of a nonfugitive extradition warrant pursuant to § 54-161, which the governor of this state signed on September 6, 2005. The petitioner has filed a second habeas petition challenging the validity of that second extradition warrant. That action, however, has been stayed pending the outcome of the present appeal.

[11] Our act is identical in all material respects to the uniform act for all purposes relevant to this appeal. For ease of reference, we note that §§ 2, 3, 5 and 6 of the uniform act are codified in this state at §§ 54-158, 54-159, 54-161 and 54-162, respectively.

constitution.[12] With respect to the language of § 54-161, which embodies § 5 of the uniform act, the commissioner maintains that the drafters of the uniform act added that provision merely to clarify the law in response to several state court decisions holding that a person leaving the demanding state under government compulsion is not a fugitive subject to extradition. We agree with the commissioner that the petitioner is a fugitive from justice whom the governor of this state is required to extradite to Texas.

Before proceeding to the merits of the certified question, we note, preliminarily, that the issue of whether the petitioner is a fugitive from justice for purposes of the act presents a question of statutory interpretation over which our review is plenary. See, e.g., *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 404, 891 A.2d 959 (2006). Furthermore, "[w]hen construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z[13] directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship,

---

[12] The constitution of the United States, article four, § 2, cl. 2, provides: "A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime."

[13] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 405.

We begin our analysis, therefore, with the relevant language of the act. General Statutes § 54-161[14] provides in relevant part that "[t]he Governor of this state may . . . surrender on demand of the executive authority of any other state any person in this state who is charged in the manner provided in section 54-179[15] with having

---

[11] We note that § 54-161 is entitled "Return to this state of person imprisoned or held in another state," whereas § 5 of the uniform act, which is codified in this state at § 54-161, is entitled "Extradition of Persons Imprisoned or Awaiting Trial in Another State or Who Have Left the Demanding State Under Compulsion." Unif. Criminal Extradition Act § 5, 11 U.L.A. 463 (2003). No inference regarding legislative intent may be drawn from this linguistic difference, however, because boldface catchlines like those accompanying § 54-161 "are prepared, and from time to time changed, by the Revisors [of the General Statutes] and are intended to be informal brief descriptions of the contents of the [statutory] sections. . . . These boldface catchlines should not be read or considered as statements of legislative intent since their sole purpose is to provide users with a brief description of the contents of the sections." Preface to the General Statutes, p. vii.

[15] General Statutes § 54-179 provides: "(a) When the return to this state of a person charged with crime in this state is required, the state's attorney shall present to the Governor his written application for a requisition for the return of the person charged, in which application shall be stated the name of the person so charged, the crime charged against him, the approximate time, place and circumstances of its commission, the state in which he is believed to be, including the location of the accused therein, at the time the application is made and certifying that, in the opinion of the state's attorney, the ends of justice require the arrest and return of the accused to this state for trial and that the proceeding is not instituted to enforce a private claim.

"(b) When the return to this state is required of a person who has been convicted of a crime in this state and has escaped from confinement or

violated the laws of the state whose executive authority is making the demand, even though such person left the demanding state involuntarily." It reasonably may be argued that the language of § 54-161 providing that our governor "may" extradite a person who "left the demanding state involuntarily," when considered in isolation from the rest of the act, vests the governor with discretion to reject an extradition demand for a person who, like the petitioner, was removed from the demanding state under legal compulsion. See, e.g., *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 349, 680 A.2d 1261 (1996) ("The word 'may,' unless the context in which it is employed requires otherwise, ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion.").

Although, by its terms, § 54-161 appears to vest the governor with discretion either to honor or reject an otherwise proper extradition demand if the accused

broken the terms of his bail, probation or parole, the state's attorney of the county in which the offense was committed, the Board of Pardons and Paroles, or the Commissioner of Correction, shall present to the Governor a written application for a requisition for the return of such person, in which application shall be stated the name of the person, the crime of which he was convicted, the circumstances of his escape from confinement or of the breach of the terms of his bail, probation or parole and the state in which he is believed to be, including the location of the person therein at the time application is made.

"(c) The application shall be verified by affidavit, shall be executed in duplicate and shall be accompanied by two certified copies of the indictment returned, or information and affidavit filed, or of the complaint made to the judge, stating the offense with which the accused is charged, or of the judgment of conviction or of the sentence. The state's attorney, Board of Pardons and Paroles or Commissioner of Correction may also attach such further affidavits and other documents in duplicate as he deems proper to be submitted with such application. One copy of the application, with the action of the Governor indicated by endorsement thereon, and one of the certified copies of the indictment, complaint, information and affidavits or of the judgment of conviction or of the sentence, shall be filed in the office of the Secretary of the State, to remain of record in that office. The other copies of all papers shall be forwarded with the Governor's requisition."

was removed from the demanding.state involuntarily, other provisions of the act lead to a contrary conclusion.[16] In particular, General Statutes § 54-158 provides in relevant part that "it is the duty of the Governor of this state to have arrested and delivered up to the executive authority of any other state . . . any person charged in that state with . . . [a] crime, who has fled from justice and is found in this state," and General Statutes § 54-159 provides in relevant part that "[n]o demand for the extradition of a person charged with crime in another state shall be recognized by the Governor unless in writing alleging, except in cases arising under section 54-162, that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter he fled from the state . . . ."[17] Thus, any person who has left the demanding state involuntarily under § 54-161 falls within the purview of § 54-159, which treats any person who comes within its terms as a fugitive from justice. When §§ 54-159 and 54-161 are read in conjunction with the governor's mandatory duty under § 54-158 to comply with any proper extradition demand for a fugitive from justice, the clear import of those provisions is that the governor *must* honor another state's extradition demand for anyone who, like the petitioner, has left the demanding state involuntarily. That conclusion, however, conflicts with the language of § 54-161 providing that our governor "may" honor an extradition demand for a person who is found in this state after leaving the demanding state involuntarily. See *Com-*

---

[16] Under § 1-2z; see footnote 13 of this opinion; we review both the text of the statute *and* its relationship to other statutes before determining whether the meaning of the text is plain and unambiguous.

[17] We note that General Statutes §§ 54-169 and 54-171, which pertain to the arrest and commitment of persons whose extradition has been sought by the executive authority of another state, also distinguish between extradition cases "arising under section 54-162" and those pertaining to persons who have "fled from justice . . . ."

*monwealth ex rel. Bonomo* v. *Haas*, 428 Pa. 167, 170 n.2, 236 A.2d 810 (1968) (noting conflict in language of Pennsylvania extradition provisions identical to §§ 54-159 and 54-161). In light of that conflict, the language of the act cannot be characterized as plain and unambiguous as applied to the extradition of the petitioner. See, e.g., *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 134 n.19, 848 A.2d 451 (2004) (statute is ambiguous if, when read in context, it is susceptible of more than one reasonable interpretation). We therefore turn to extratextual sources of evidence to determine whether the petitioner is subject to mandatory or discretionary extradition under the act.

To put that extratextual evidence in proper context, however, we briefly review the history of extradition and the law pertaining to fugitives. Under the extradition clause of the federal constitution; U.S. Const., art. IV, § 2, cl. 2; see footnote 12 of this opinion; any state may require any other state to deliver up any person deemed to be a fugitive from justice from the demanding state. "[T]he commands of the Extradition Clause are mandatory, and afford no discretion to the executive officers or the courts of the asylum State." (Internal quotation marks omitted.) *New Mexico ex rel. Ortiz* v. *Reed*, 524 U.S. 151, 154, 118 S. Ct. 1860, 141 L. Ed. 2d 131 (1998); see also 1 F. Wharton, Criminal Procedure (14th Ed. 2005) § 6:12, p. 6-78 ("the right to extradition is a sovereign right of a state and is not a right that attaches to a prisoner"). Because the extradition clause is not self-executing; *Roberts* v. *Reilly*, 116 U.S. 80, 94, 6 S. Ct. 291, 29 L. Ed. 544 (1885); Congress passed legislation, now codified at 18 U.S.C. § 3182,[18] setting

---

[18] Title 18 of the United States Code, § 3182, provides: "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State, District, or Territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of

forth the procedure by which an executive authority of one state shall surrender a fugitive from justice to the executive authority of another state. See Unif. Criminal Extradition Act prefatory note, 11 U.L.A. 291 (2003) ("[t]he Constitution creates the right to demand the fugitive, and the federal law creates the machinery, and they thus distinguish interstate extradition from international extradition which rests entirely upon treaties and is defined by treaty limitations").

The United States Supreme Court long has recognized that "[t]he Extradition Clause was intended to enable each state to bring offenders to trial as swiftly as possible in the state where the alleged offense was committed. . . . The purpose of the Clause was to preclude any state from becoming a sanctuary for fugitives from justice of another state and thus 'balkanize' the administration of criminal justice among the several states." (Citations omitted.) *Michigan* v. *Doran*, 439 U.S. 282, 287, 99 S. Ct. 530, 58 L. Ed. 2d 521 (1978); see also *Biddinger* v. *Commissioner of Police*, 245 U.S. 128, 132–33, 38 S. Ct. 41, 62 L. Ed. 193 (1917) (purpose of extradition clause of federal constitution is to eliminate state boundaries as impediment to extradition from one state to another). To promote that purpose, the term "fugitive from justice" has been construed broadly: "To be regarded as a fugitive from justice it is not necessary that one shall have left the State in which the crime is alleged to have been committed for the very purpose of avoiding prosecution, but simply that, having committed there an act which by the law of the State consti-

the State or Territory from whence the person so charged has fled, the executive authority of the State, District, or Territory to which such person has fled shall cause him to be arrested and secured, and notify the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and shall cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within thirty days from the time of the arrest, the prisoner may be discharged." 18 U.S.C. § 3182 (2000).

tutes a crime, he afterwards has departed from its jurisdiction and when sought to be prosecuted is found within the territory of another State."[19] *Hogan* v. *O'Neill*, 255 U.S. 52, 56, 41 S. Ct. 222, 65 L. Ed. 497 (1921). The United States Supreme Court repeatedly has employed this expansive definition in identifying those persons deemed to be fugitives from justice. See, e.g., *Strassheim* v. *Daily*, 221 U.S. 280, 285, 31 S. Ct. 558, 55 L. Ed. 735 (1911); *Appleyard* v. *Massachusetts*, 203 U.S. 222, 229, 27 S. Ct. 122, 51 L. Ed. 161 (1906); *Roberts* v. *Reilly*, supra, 116 U.S. 97.

Consistent with this broad construction of the term "fugitive from justice," federal extradition laws traditionally "have not been construed narrowly and technically by the courts as if they were penal laws, but liberally to effect their important purpose, with the result that one who leaves the demanding State before prosecution is anticipated or begun, or without knowledge on his part that he has violated any law, or who, having committed a crime in one State, returns to his home in another, is nevertheless decided to be a fugitive from justice within their meaning." *Biddinger* v. *Commissioner of Police*, supra, 245 U.S. 133. "[W]hen the extradition papers required by the statute are in the proper form the only evidence sanctioned by this court as admissible [in an extradition proceeding] is such as tends to prove that the accused was not in the demanding State at the time the crime is alleged to have been committed . . . ." Id., 135. Thus, "[o]nce [a] governor has granted extradition, a court considering release on habeas corpus can do no more than decide

---

[19] "Courts have been free to give this meaning to the Constitution and statutes because in delivering up an accused person to the authorities of a sister State they are not sending him for trial to an alien jurisdiction, with laws which our standards might condemn, but are simply returning him to be tried, still under the protection of the Federal Constitution but in the manner provided by the State against the laws of which it is charged that he has offended." *Biddinger* v. *Commissioner of Police*, supra, 245 U.S. 133.

(a) whether the extradition documents on their face are in order; (b) whether the petitioner has been charged with a crime in the demanding state; (c) whether the petitioner is the person named in the request for extradition; and (d) whether the petitioner is a fugitive." *Michigan* v. *Doran*, supra, 439 U.S. 289; accord *Narel* v. *Liburdi*, 185 Conn. 562, 565, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982).

In *Moulthrope* v. *Matus*, supra, 139 Conn. 272, this court also adopted an expansive definition of the term "fugitive from justice" in rejecting a claim by the petitioner in that case that he was not subject to extradition from this state to Florida because he previously had been removed to this state from Florida under government compulsion. Id., 276–78; see footnote 7 of this opinion. We explained that the reason for a person's departure from the demanding state does not alter that person's status as a fugitive from justice: "One need not necessarily have left the state for the purpose of avoiding arrest or prosecution to be a fugitive from justice. . . . It is enough if, after committing a crime in one jurisdiction, the perpetrator departs and is later found in another. . . . A paroled convict who has left one state with the express consent of the authorities can nevertheless become a fugitive from justice in another state when his parole has been revoked. . . . This is true even [when] the paroling state has forced him to leave as a condition of his parole. . . . It has frequently been held that, even if the prisoner was forcibly removed from the state by federal authorities, he is still a fugitive from justice."[20] (Citations omitted.)

[20] Although any person deemed to be a fugitive from justice is subject to mandatory extradition, we note that, "[i]n order for [a person] to be a fugitive, it is essential that he was in the demanding state at the time the crime for which he is being extradited was actually committed." *Stenz* v. *Sandstrom*, 143 Conn. 72, 75, 118 A.2d 900 (1955).

*Moulthrope* v. *Matus*, supra, 276–77; see also *Barrila* v. *Blake*, 190 Conn. 631, 634–35, 461 A.2d 1375 (1983) ("[a] person is a fugitive from justice if he commits a crime in one state and is thereafter found in another state"); *Ross* v. *Hegstrom*, 157 Conn. 403, 411–12, 254 A.2d 556 (1969) ("[a] person charged . . . with the commission within a State of a crime covered by its laws, and who, after the date of the commission of such crime leaves the State—no matter for what purpose or with what motive, nor under what belief—becomes, from the time of such leaving . . . a fugitive from justice").

Because 18 U.S.C. § 3182 does not purport to address all of the exigencies that may arise in interstate extradition, various states began legislating on subjects collateral to the main right to extradition but not covered under 18 U.S.C. § 3182. Unif. Criminal Extradition Act prefatory note, supra, 11 U.L.A. 291–92. In response to a growing body of divergent extradition law among the states, the National Conference of Commissioners on Uniform State Laws undertook to "prepare an act embracing what appear to be the best features of all the various laws of the several states as well as the judicial law applicable, and to offer it as a practicable law for all the states to adopt, thus codifying the practice and promoting uniformity at the same time." Id., 292. This proposed uniform act subsequently was approved by the National Conference of Commissioners on Uniform State Laws in 1936.[21] Id., 293.

Our legislature adopted the uniform act "in toto" in 1957; 7 S. Proc., Pt. 4, 1957 Sess., p. 2377, remarks of

---

[21] In 1980, the National Conference of Commissioners on Uniform State Laws approved the Uniform Extradition and Rendition Act in an effort to streamline what were perceived to be certain unnecessarily cumbersome requirements of the Uniform Criminal Extradition Act. See Unif. Extradition and Rendition Act prefatory note, 11 U.L.A. 88 (2003). To date, however, only North Dakota has adopted the Uniform Extradition and Rendition Act. See N.D. Cent. Code § 29-30.3-01 et seq. (2006).

Senator John H. Shannon; see General Statutes (Rev. to 1958) § 54-157 et seq. The primary purpose of the legislation was "to make uniform the law of those states which enact it. It also codifies the procedural features relating to extradition and serves to expedite the execution of both the constitutional provision and the federal law." (Internal quotation marks omitted.) *Glavin* v. *Warden*, 163 Conn. 394, 395 n.1, 311 A.2d 86 (1972).

Although the uniform act was predicated largely on existing statutory law and judicial decisions from around the country, several provisions, including § 6 of the uniform act, which is codified in this state at § 54-162, and the second sentence of § 5 of the uniform act, which is codified in this state at § 54-161, "originated with the National Conference of Commissioners on Uniform State Laws and [were] designed to cover cases not clearly reached by existing extradition laws." Unif. Criminal Extradition Act prefatory note, supra, 11 U.L.A. 292. As the prefatory note to the uniform act explains, "it ha[d] been possible to extradite only those criminals who could be said to be 'fugitives,' that is, who had been physically present in the state in which the crime [had been] committed and had fled therefrom. One who commit[ted] a crime against the laws of a state by acts done outside of that state ha[d] been held not to be a 'fugitive.' Courts ha[d] been in conflict as to whether one whose criminal acts [had been] done within the state [could] be said to be a 'fugitive' when his departure from the state [had been] under the legal compulsion of an extradition proceeding." Id.

The prefatory note also explains that the sections of the uniform act that are codified in this state at §§ 54-161 and 54-162 were "drafted to meet the practical need of authority for the extradition of both of these classes of criminals who, perhaps, [could not] technically be called 'fugitives.' " Id. With respect to the language of the uniform act that is codified at § 54-161, the prefatory

note explains that the second paragraph of that section "authorizes the extradition of a criminal who, under the decisions of some states, has been held not to be a 'fugitive' because his departure from the state in which the crime [had been] committed was under compulsory process." Id. The drafters of the uniform act further explained, in the commentary to the second paragraph of that same section, that the reason for the language "lies in the fact that there is a conflict in the decisions upon the question whether a person who has been removed from a state under the compulsion of the authority of that state can be classed as a 'fugitive' from that state so that his return can be secured through extradition proceedings."[22] Unif. Criminal Extradition Act § 5, comment, supra, 11 U.L.A. 464. With this historical background in mind, we turn to the merits of the commissioner's contention that, contrary to the conclusion of the Appellate Court, the petitioner is a fugitive from justice even though he was removed to this state from Texas under legal compulsion.

First, the explanation that the drafters of the uniform act had given for the inclusion of the language contained in §§ 54-161 and 54-162, when considered in light of the

---

[22] With respect to the language of § 6 of the uniform act, which is codified in this state at § 54-162, the prefatory note states that that preuniform act language that the National Conference of Commissioners on Uniform State Laws had approved "provided for the extradition of a criminal from the state in which he acted to the state in which his acts had criminal effect. . . . [Under the uniform act as approved, § 6] permits the extradition of that person not only from the state in which he acted, but from any state into which he thereafter moves. It is true that the Constitution does not put upon the states the obligation to extradite criminals who are not fugitives. But, though the Constitution requires that fugitives shall be extradited, it does not prohibit states from endeavoring to enforce the criminal law by the extradition of those persons who have violated the law of the demanding state but who cannot be called 'fugitives' from that state. The effectiveness of Section 6, therefore, depends upon comity between the states, rather than upon the mandatory effect of the Constitution." Unif. Criminal Extradition Act prefatory note, supra, 11 U.L.A. 292.

law of this state at the time our act was passed, supports the commissioner's contention that the petitioner is subject to mandatory extradition under our statutory scheme.[23] According to the drafters of the uniform act, the section of the act that is codified in this state at § 54-162 was intended to permit the extradition of persons who, because they were not in the demanding state at the time of the commission of the crime, traditionally were not considered to be fugitives from justice and, therefore, not subject to extradition under the law of some states. With respect to that section of the uniform act codified in this state at § 54-161, the drafters explained that the second paragraph of that provision was necessary because, in some states, persons leaving the demanding state under compulsory process were not considered fugitives, and, therefore, those persons were not subject to extradition in those states for which the extradition of nonfugitives had not been authorized. Thus, the language of § 6 of uniform act that is contained in § 54-162 and of § 5 of the uniform act that is contained in the second sentence of § 54-161[24] was included in

[23] Although the Appellate Court did not address the significance of the official commentary accompanying the uniform act, that commentary informs our understanding of the intent of our legislature in passing the uniform act because the legislature adopted the uniform act in its entirety, and there is virtually no legislative history concerning the passage of the act in this state. In the absence of any indication to the contrary, we reasonably may presume that our legislature adopted the act for the same reasons that it was approved by the National Conference of Commissioners on Uniform State Laws. See, e.g., *Dunn* v. *Hindman*, 18 Kan. App. 2d 537, 540, 855 P.2d 994 ("When the legislature adopts a statute from a uniform law [such as the Uniform Criminal Extradition Act], it carries with it the construction placed upon that statute by the drafters except [when] such construction is contrary to the constitution or public policy of the adopting state. In determining the legislative intent, courts are not limited to mere consideration of the language employed but may also examine the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under various constructions suggested."), review denied, 253 Kan. 857 (1993).

[24] We note that, although § 5 of the uniform act is broken into two paragraphs, § 54-161 consists of two sentences within the same paragraph. The

the uniform act for the purpose of authorizing the extradition of the two classes of persons identified therein by those states that previously had lacked the authority to do so. Prior to the passage of the act in this state, however, the governor already had the authority, under *Moulthrope* v. *Matus*, supra, 139 Conn. 272, to extradite persons who had left the demanding state involuntarily under government compulsion; indeed, in light of our conclusion in *Moulthrope* that those persons were fugitives, our governor already had a *duty* to extradite them upon proper demand. See id., 275–76. It is apparent, therefore, that the language of the second sentence of § 54-161 was included merely because the legislature adopted the uniform act in its entirety, including that authorizing provision, and not because of any intent to make a substantive change in the law as it pertained to the extradition of such persons.[25] Although this con-

second sentence of § 54-161 is identical in all material respects to the second paragraph of § 5 of the uniform act.

[25] Relying on the prefatory note and commentary to the uniform act, the petitioner contends that the language of the second paragraph of § 5 of the uniform act reflects the decision of the drafters to adopt the holding of the California Court of Appeal in *In re Application of Whittington*, 34 Cal. App. 344, 347, 167 P. 404 (1917), that a person who has been removed involuntarily from the demanding state by government compulsion is not subject to extradition as a fugitive. Under the view advanced by the petitioner, the drafters of the uniform act reached a compromise that expressly *permits* the removal of such persons, but that does not *require* it, by treating them as nonfugitives subject to discretionary extradition. We fundamentally disagree with the petitioner's interpretation of the explanatory comments to the uniform act, primarily because we disagree that those comments reflect the compromise that the petitioner asserts they do. We note, moreover, that, prior to the approval of the uniform act in 1936 by the National Conference of Commissioners on Uniform State Laws, the United States Supreme Court repeatedly had stated that a person is considered a fugitive from justice no matter what the reason or purpose for his or her departure from the demanding state; see, e.g., *Biddinger* v. *Commissioner of Police*, supra, 245 U.S. 133; *Appleyard* v. *Massachusetts*, supra, 203 U.S. 227, 229; *Roberts* v. *Reilly*, supra, 116 U.S. 97; and, consistent with that general rule, the substantial weight of authority favored the view that a person who departs the demanding state involuntarily under legal compulsion is subject to extradition as a fugitive from justice. See, e.g., *Hart* v. *Mangum*, 146 Ga. 497, 91 S.E. 543 (1917); *People ex rel. McFadden* v. *Meyering*, 358 Ill. 442, 445–46,

struction of the second sentence of § 54-161 effectively renders that provision superfluous for purposes of our act, the uniform act was drafted in the anticipation that it would be adopted by all states, including those states in which it had been determined that the governor lacked the authority to extradite persons leaving the demanding state involuntarily. In light of the reason why that language was inserted into the uniform act, we are not persuaded that the drafters of the uniform act intended for the language to be given a literal construction in those states, like Connecticut, in which the authority of the governor to extradite persons leaving the demanding state involuntarily already had been established.[26]

As we previously have explained, this interpretation of the act also finds support in the text of § 54-159,

193 N.E. 475 (1934); *In re Petition of Martin*, 142 Kan. 907, 909, 52 P.2d 1196 (1935); *State ex rel. Shapiro* v. *Wall*, 187 Minn. 246, 249, 244 N.W. 811 (1932); *People ex rel. Hutchings* v. *Mallon*, 218 App. Div. 461, 471, 218 N.Y.S. 432 (1926), aff'd, 245 N.Y. 521, 157 N.E. 842 (1927). We further note that the soundness of the holding in *In re Application of Whittington* has been questioned by the California Court of Appeal; see *In re Fedder*, 143 Cal. App. 2d 103, 111, 299 P.2d 881 (1956); and consistently rejected as contrary to the weight of authority by other courts that have considered the issue. See, e.g., *United States ex rel. Moulthrope* v. *Matus*, 218 F.2d 466, 468 (2d Cir. 1954); *Moulthrope* v. *Matus*, supra, 139 Conn. 277; *People ex rel. Hutchings* v. *Mallon*, supra, 471. In sum, we are not persuaded that the drafters of the uniform act opted for the oft-criticized and distinct minority view expressed in *In re Application of Whittington*.

[26] We acknowledge that, "[a]s a general rule of statutory interpretation, we will not read a statute in such a way as to render a portion of it superfluous." *State* v. *Christiano*, 228 Conn. 456, 472, 637 A.2d 382, cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994). Although important, that general rule, like other such rules, "is merely an axiom of statutory construction, not an inviolate rule of law; and, like all such axioms, it provides a guideline to legislative meaning, but it cannot displace the result of careful and thoughtful interpretation." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 703 n.34, 855 A.2d 212 (2004). In the present case, that process of interpretation leads us to agree with the commissioner that the petitioner is subject to the mandatory provisions of our statutory scheme governing extradition.

which requires the executive authority of the demanding state to allege, for all persons except those falling under § 54-161, that the person sought to be extradited fled from the demanding state and, therefore, is a fugitive from justice. If the drafters of the uniform act had intended to except from the demand requirement of § 3 of the uniform act (§ 54-159) those persons who had left the demanding state involuntarily under § 5 of the uniform act (§ 54-161), they presumably would have done so, as they did for those persons covered by § 6 of the uniform act (§ 54-162). We see no reason why the drafters of the uniform act would have required an allegation of flight for persons departing the demanding state under legal compulsion if the drafters had not intended for such persons to be treated as fugitives subject to the mandatory extradition provisions of the act.[27]

---

[27] The petitioner contends that § 54-159 does not support the commissioner's claim because § 54-179; see footnote 15 of this opinion; rather than § 54-159, governs the demand requirements pertaining to persons whose extradition is sought pursuant to § 54-161. In support of his contention, the petitioner relies on the language of General Statutes § 54-161 that provides: "The Governor of this state may also surrender on demand of the executive authority of any other state any person in this state who is charged *in the manner provided in section 54-179* . . . ." (Emphasis added.) Section 54-179 sets forth the procedure pursuant to which a state's attorney, the board of pardons and paroles, or the commissioner of correction shall make an application to the governor of this state for a requisition seeking the return of a person who has been charged with a crime in this state. Because § 54-179 does not require the applicant to allege that the person whose extradition is sought has fled from this state, the petitioner contends that § 54-161, which refers to § 54-179, also does not require an allegation of flight. We are not persuaded that the reference to § 54-179 in § 54-161 relieves the governor of the responsibility under § 54-159 to deny the demanding state's extradition request unless there is an allegation "that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter he fled from the [demanding] state," as General Statutes § 54-159 requires. Section 54-159 unambiguously bars the governor of this state from complying with *any* extradition demand, except a demand made in accordance with § 54-162, unless the demanding state alleges that the person whose extradition is sought was present in the demanding state and thereafter fled from that state. Reading § 54-161 together with § 54-159,

We also agree with the commissioner that the determination of the Appellate Court that § 54-161 overruled our holding in *Moulthrope* places that statutory section in constitutional jeopardy. Our conclusion in this regard is based on our reasoning in *Moulthrope*: "The decisive question presented . . . is whether [the petitioner, Watson Moulthrope was] a fugitive from justice within the meaning of [the extradition clause of] the federal constitution and [18 U.S.C. § 3182] the [statute] permitting the extradition from one state to another of a person charged with crime. . . .

" 'A person charged by indictment or by affidavit before a magistrate with the commission within a State of a crime covered by its laws, and who, after the date of the commission of such crime leaves the State—no matter for what purpose or with what motive, nor under what belief—becomes, from the time of such leaving, and within the meaning of the Constitution and the laws of the United States, a fugitive from justice, and if found in another state must be delivered up by the Governor of such State to the State whose laws are alleged to have been violated, on the production of such indictment or affidavit, certified as authentic by the Governor of the State from which the accused departed. Such is the command of the supreme law of the land, which may not be disregarded by any State.' *Appleyard* v. *Massachusetts*, [supra, 203 U.S. 227] . . . ." (Citations omitted.) *Moulthrope* v. *Matus*, supra, 139 Conn. 275–76. After restating Moulthrope's claim that he was not a fugitive from justice from Florida because he had been removed therefrom involuntarily, we concluded that "[t]he adoption of any such proposition would tend to defeat the purpose of extradition, which is to prevent state boundaries from providing those charged with crime with a means of asylum. Even though [Moul-

it is apparent that an extradition demand under § 54-161 must satisfy the requirements of both §§ 54-159 and 54-179.

thrope] was removed from Florida by legal process and against his will, *he is* [*nonetheless*] *a fugitive from justice in the sense required by a reasonable and salutary construction of the constitution and the statutes.* [Moulthrope's] efforts to avoid extradition on this ground must fail." (Emphasis added.) Id., 277–78.

The commissioner contends that it is clear from this language that our holding in *Moulthrope* is predicated on controlling federal authority, most importantly, the extradition clause of the United States constitution. The commissioner further claims that that holding cannot be overruled by statute because state legislation pertaining to extradition "is valid only to the extent to which it aids and is not inconsistent with the federal Constitution and statutes." *In re Fedder*, 143 Cal. App. 2d 103, 110, 299 P.2d 881 (1956); see also *In re Gay*, 406 Mass. 471, 474, 548 N.E.2d 879 (1990) (recognizing that Massachusetts extradition statute "must be construed in light of, and harmonized with, the extradition clause of the Federal Constitution"). Because this court in *Moulthrope* relied heavily on constitutional principles, the commissioner's argument has considerable persuasive force. For purposes of this case, however, we need not decide whether our conclusion in *Moulthrope* is properly characterized as constitutionally based and, therefore, not subject to legislative overruling, or whether the Appellate Court was correct in treating our analysis in that case as resting on common-law principles relating to extradition. See *Clark* v. *Commissioner of Correction*, supra, 88 Conn. App. 184. It suffices to say that there exists a serious question as to whether the interpretation of § 54-161 adopted by the Appellate Court creates a conflict between that provision and the extradition clause of the federal constitution. We often have stated that statutes are to be read so as to avoid, rather than create, constitutional questions. E.g., *In re Valerie D.*, 223 Conn. 492, 534,

613 A.2d 748 (1992). Furthermore, "[i]n choosing between two constructions of a statute, one valid and one constitutionally precarious, we will search for an effective and constitutional construction that reasonably accords with the legislature's underlying intent." (Internal quotation marks omitted.) *State* v. *Quinet*, 253 Conn. 392, 415, 752 A.2d 490 (2000). Our responsibility to avoid a construction of § 54-161 that places it in constitutional jeopardy militates in favor of the interpretation advanced by the commissioner.

Even if we assume, however, that our holding in *Moulthrope* is rooted in the common law rather than in the federal constitution, there is nothing in the sparse legislative history of the act to suggest that the legislature intended to overrule *Moulthrope*. Although "the legislature's authority to abrogate the common law is undeniable, we will not lightly impute such an intent to the legislature. . . . Thus, [w]hen a statute is in derogation of common law . . . it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction. . . . In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed. . . . The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law." (Internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 788–89, 865 A.2d 1163 (2005). Because neither the language nor the

history of the act represents an unambiguous expression of legislative intent to overrule our holding in *Moulthrope*, we will not presume that the legislature intended to accomplish that result.

We believe, moreover, that the commissioner's interpretation of the act is most consistent with the purpose of the extradition clause, namely, to promote each state's strong interest in the speedy prosecution of persons who, having been charged with a crime in a particular state, leave that state and are found in another state. Federal extradition provisions have been construed liberally to effectuate that objective; see, e.g., *Biddinger* v. *Commissioner of Police*, supra, 245 U.S. 133; and we see no reason to deviate from that approach for purposes of interpreting this state's extradition laws. Construing the act liberally in favor of extradition leads us to conclude that the petitioner is subject to the mandatory provisions of the act because, under that construction, the decision to prosecute remains exclusively in the hands of the demanding state, without any potential interference from this state.[28]

Finally, the decided weight of authority under the uniform act supports the conclusion that a person who

---

[28] In addition, certain language in the prefatory note to the uniform act buttresses our conclusion that the petitioner's extradition to Texas is mandatory. Specifically, the prefatory note provides, with respect to the language of the uniform act codified in this state at § 54-162 and pertaining to persons who were not in the demanding state at the time of the commission of the crime, that "[t]he effectiveness of [that section] . . . depends upon comity between the states, rather than upon the mandatory effect of the Constitution." Unif. Criminal Extradition Act prefatory note, supra, 11 U.L.A. 292. The prefatory note to the uniform act contains no such statement regarding the need for "comity between the states" with respect to the language of the uniform act codified in this state at § 54-161 and pertaining to persons who, like the petitioner in the present case, were removed from the demanding state under government compulsion. That commentary is important because it suggests that the language of § 54-162 was intended to apply to nonfugitives for whom extradition is discretionary, whereas the language of § 54-161 was intended to apply to fugitives for whom extradition is mandatory.

leaves the demanding state by government compulsion is a fugitive from justice subject to mandatory extradition. See, e.g., *In re Fedder*, supra, 143 Cal. App. 2d 113–14; *Golla* v. *State*, 52 Del. 433, 437, 159 A.2d 585, cert. denied, 364 U.S. 841, 81 S. Ct. 78, 5 L. Ed. 2d 64 (1960); *In re Application of Butler*, 346 P.2d 348, 351, 354 (Okla. Crim. App. 1959), cert. denied, 363 U.S. 846, 80 S. Ct. 1620, 4 L. Ed. 2d 1729 (1960); *Commonwealth ex rel. Bonomo* v. *Haas*, supra, 428 Pa. 171–73; *Ex parte Guinn*, 162 Tex. Crim. 293, 294, 284 S.W.2d 721 (1955); *State ex rel. O'Connor* v. *Williams*, 95 Wis. 2d 378, 382–83, 290 N.W.2d 533 (App. 1980); cf. *State ex rel. Borrink* v. *State*, 10 Neb. App. 293, 298–99, 634 N.W.2d 18 (2001) (person is fugitive from justice even though he left demanding state and relocated in asylum state in compliance with condition of probation imposed in demanding state). See generally 35 C.J.S. 278, Extradition and Detainers § 14 (1999) ("the fact that a person's departure was involuntary or under legal compulsion will not, under most authorities, preclude his extradition as a fugitive from justice, and this is so under the Uniform Criminal Extradition Act"). Although the Appellate Court relied on cases from New York, Florida, Kansas and California in concluding that the position advanced by the petitioner represents the majority view; see *Clark* v. *Commissioner of Correction*, supra, 88 Conn. App. 188–92; our review of the relevant case law leads us to a contrary conclusion. Moreover, for the reasons that follow, we disagree with the Appellate Court that the cases on which it relied provide persuasive support for its interpretation of the act.

We begin our examination of that precedent with the two New York cases on which the Appellate Court relied, namely, *People ex rel. Davis* v. *Quinlan*, 69 Misc. 2d 708, 330 N.Y.S.2d 544 (1972), and *People ex rel. Brunner* v. *Dominy*, 22 Misc. 2d 863, 191 N.Y.S.2d 46 (1959). It is true that, in each of those two cases, the trial court

determined that, under the version of the uniform act adopted in New York, the subject of an extradition demand who had been removed involuntarily from the demanding state by government compulsion was not a fugitive and, therefore, was subject to extradition only in the exercise of discretion by the governor of New York. See *People ex rel. Davis* v. *Quinlan,* supra, 709; *People ex rel. Brunner* v. *Dominy,* supra, 864–65. There is a significant difference, however, between § 54-159 of our act; see footnote 1 of this opinion; which is identical in all material respects to § 3 of the uniform act, and the analogous provision in the New York act, namely, § 570.08 of the New York Criminal Procedure Law, which provides in relevant part that "[n]o demand for the extradition of a person charged with a crime in another state shall be recognized by the governor unless in writing alleging that the accused was present in the demanding state at the time of the commission of the alleged crime, and that thereafter he fled from the state, *except in cases arising under section 570.14 or 570.16* . . . ."[29] N.Y. Crim. Proc. Law § 570.08 (McKinney 1995). Sections 570.14 and 570.16 of the New York Criminal Procedure Law are identical in all material respects to §§ 54-161 and 54-162 of our act, which provide, respectively, for the extradition of persons who leave the state involuntarily and for the extradition of persons who were not in the demanding state when the crime was committed. In contrast to § 54-159 of our act, which, in accordance with § 3 of the uniform act, permits this state's governor to honor an extradition demand that does not allege that the subject of the demand "fled from the state" *only* in situations involving persons who were not in the state when the crime was committed,

[29] The citations to the New York act governing extradition reflect the current codification of those provisions in the New York Criminal Procedure Law. Although those provisions have been renumbered since the decisions in *Quinlan* and *Dominy* were rendered, the substance of the provisions has not changed.

the analogous New York provision, namely, § 570.08 of the New York Criminal Procedure Law, also *expressly excepts from its terms* persons who leave the state involuntarily. The fact that New York excepts such persons from the demand requirement of its version of § 3 of the uniform act—that is, New York does not require an allegation that persons who leave the state involuntarily have "fled from the state"—strongly suggests that New York did not intend for those persons to be treated as fugitives from justice subject to mandatory extradition.[30] In light of the material difference between this state's version of § 3 of the uniform act, that is, § 54-159, and New York's version of that provision of the uniform act, and because that difference bears directly on the manner in which each state treats persons who have left the demanding state involuntarily, neither *Quinlan* nor *Dominy* is persuasive authority with respect to the proper construction of § 54-159.

Furthermore, in *People ex rel. Schank* v. *Gerace*, 231 App. Div. 2d 380, 661 N.Y.S.2d 403 (1997), the Appellate Division of the New York Supreme Court recently cast doubt on the validity of the holdings in *Quinlan* and *Dominy*, albeit without reference to those two cases. The court stated: "In determining whether [an accused] is a fugitive, a court of the asylum State must consider that a fugitive from justice is a person who commits a crime within a state, and withdraws . . . from such jurisdiction without waiting to abide the consequences . . . . [T]he simple requirement is that the accused, having committed a crime in a demanding State, is pres-

---

[30] We note that neither *Quinlan* nor *Dominy* relied expressly on the difference between § 3 of the uniform act and § 570.08 of the New York Criminal Procedure Law in concluding that a person who is removed involuntarily from the demanding state is not a fugitive from justice under New York law. We also note that neither case contains any reference to the commentary to the uniform act; both cases relied solely on the language of the New York act. See generally *People ex rel. Davis* v. *Quinlan*, supra, 69 Misc. 2d 709; *People ex rel. Brunner* v. *Dominy*, supra, 22 Misc. 2d 864–65.

ent in an asylum State when a demanding State seeks to prosecute the offense . . . . Although Federal and State statutes refer to the [accused] having fled from the demanding State . . . fled simply means left . . . . There is no connotation of escape, and it is immaterial what the [accused] believed when he left or whether his purpose was to avoid prosecution . . . .

"Similarly, under Federal and State law, *it is immaterial to the status of the [accused] as a fugitive whether his absence from the demanding State or presence in the asylum State is voluntary or involuntary* . . . . *Nor does it matter that the [accused] left the demanding State with the knowledge or permission, or even at the insistence or procurement, of its officials* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 386–87. Because the trial court decisions in *Quinlan* and *Dominy* conflict with this explication of the law by the Appellate Division, it is uncertain whether those cases retain any continuing vitality.

We also disagree that Florida case law provides persuasive support for the conclusion that the petitioner is not a fugitive from justice under the provisions of the uniform act. In reaching that conclusion, the Appellate Court relied, in particular, on *Matter of Extradition of Dixon*, 487 So. 2d 1195 (Fla. App.), review denied, 492 So. 2d 1335 (Fla. 1986), cert. denied, 479 U.S. 1054, 107 S. Ct. 928, 93 L. Ed. 2d 979 (1987). Construing Florida's extradition statutes, which are identical in all material respects to the provisions of our act, the Florida District Court of Appeal held that the petitioner in that case, Walter Dixon, whose extradition from Florida had been sought by Mississippi following his involuntary removal to Florida from Mississippi by government process, was not a fugitive under Florida law. Id., 1197–98. The court therefore concluded that Dixon was subject to discretionary rather than mandatory extradition to Missis-

sippi. See id. The Florida court apparently based its determination primarily on New York case law, in particular, *People ex rel. Brunner* v. *Dominy*, supra, 22 Misc. 2d 863. See *Matter of Extradition of Dixon*, supra, 1197–98. Accordingly, we find *Matter of Extradition of Dixon* unpersuasive for the same reasons that we find *Dominy* unconvincing.

We also disagree with the Appellate Court's reliance on *Dunn* v. *Hindman*, 18 Kan. App. 2d 537, 855 P.2d 994, review denied, 253 Kan. 857 (1993). In *Dunn*, the petitioner, Lisa Dunn, claimed that she was not a fugitive from justice within the meaning of Kansas' version of the uniform act because she had left the demanding state under the personal compulsion of another individual. Id., 539. The Kansas Court of Appeals rejected Dunn's contention on the ground that extradition is discretionary only with respect to persons who leave the demanding state under *legal* compulsion, not under *personal* duress or compulsion, in which case extradition is mandatory. See id., 540. The court's statement regarding legal or government compulsion was dictum, however, unaccompanied by any meaningful analysis of the history of or commentary to the uniform act. We, therefore, are disinclined to rely on *Dunn* for the purpose of determining whether the petitioner in the present case is subject to mandatory or discretionary extradition under the act.[31]

---

[31] We note that there is language in an earlier Kansas Supreme Court case, *State* v. *Woody*, 215 Kan. 353, 524 P.2d 1150, cert. denied, 419 U.S. 1003, 95 S. Ct. 322, 42 L. Ed. 2d 278 (1974), that seems to conflict with the dictum of the Kansas Court of Appeals in *Dunn* v. *Hindman*, supra, 18 Kan. App. 2d 540. In particular, the court in *Woody* stated: "A person accused or convicted of [a] crime does not have to leave a state voluntarily to be a fugitive from justice and subject to extradition. The fact that the petitioner [Ralph Woody] was brought into the asylum state by federal authorities does not alter his situation, and he is subject to be delivered to the demanding state upon proper extradition process. . . . The general rule is [when] one commits an offense in the demanding state and thereafter goes or is taken into another or asylum state, his motives in leaving or the reasons why he has left the demanding state are immaterial." (Citation omitted.) *State* v.

In further support of its interpretation of the act, the Appellate Court observed that California courts "have adopted the same rule as that of New York, Florida and Kansas." *Clark* v. *Commissioner of Correction*, supra, 88 Conn. App. 191–92. In particular, the Appellate Court relied on *In re Patterson*, 64 Cal. 2d 357, 363–64, 411 P.2d 897, 49 Cal. Rptr. 801 (1966), a case that the Appellate Court characterized as holding that a person who is removed involuntarily from the demanding state by government compulsion is subject to discretionary, rather than mandatory, extradition under California's version of the uniform act. *Clark* v. *Commissioner of Correction*, supra, 192. In *In re Patterson*, however, the California Supreme Court went no further than to say that "[t]here may be some question whether [such a person] would be classified as a fugitive from justice"; *In re Patterson*, supra, 363–64; concluding, ultimately, that it was "unnecessary to decide [that] issue" for purposes of the case. Id., 364.

In contrast to *In re Patterson*, however, the California Court of Appeal, in *In re Fedder*, supra, 143 Cal. App. 2d 103, did address the merits of that issue. In that case, the petitioner, Donald Lee Fedder, was charged with committing a felony in Utah. Id., 105. Ultimately, Fedder was convicted of that charge. Id. Fedder successfully applied for probation, and his prison sentence was suspended. Id. Although one of the conditions of his probation was that Fedder report to his probation officer, he subsequently failed to do so. Id. Consequently, his probation was revoked and his term of imprisonment was reinstated in absentia. See id., 105–106. Thereafter, Fedder was arrested in Idaho and charged with burglary. Id., 106. He ultimately was convicted as charged and sentenced to a prison term of not more than fifteen

*Woody,* supra, 363. To the extent that the dictum in *Dunn* may be construed as inconsistent with *Woody,* that is further reason not to follow *Dunn.*

years. Id. He remained free on bond, however, pending his appeal. Id.

Subsequently, after Utah authorities located Fedder in Idaho, the governor of Utah sought to have Fedder extradited from Idaho to Utah. Id., 107. In accordance with that request, the governor of Idaho caused Fedder to be arrested by Idaho authorities. Id. Fedder unsuccessfully challenged his extradition to Utah, and, before serving his Idaho sentence, he was removed to Utah in accordance with Utah's extradition demand. Id. Upon the completion of his sentence in Utah, the governor of Idaho, who, on the basis of information that Fedder had relocated to California, signed a rendition demand for Fedder addressed to the governor of California. Id. The governor of California granted Idaho's request for Fedder's extradition, and Fedder was arrested by California authorities. Id., 107–108. Fedder filed a habeas petition, claiming, inter alia, that he was not a fugitive from Idaho because he had not "fled" from that state but, rather, had been removed involuntarily under government compulsion. Id., 105, 108–109.

Applying California's version of the uniform act, the court rejected Fedder's claim.[32] Id., 114. The court first set forth the general rule that "[t]he mode or manner of a person's departure from the state generally does not affect his status as a fugitive from justice; so the fact that a person's departure was involuntary or under legal compulsion will not, under most authorities, preclude his extradition as a fugitive from justice . . . ." (Citations omitted; internal quotation marks omitted.) Id., 110. The court further indicated that California's version of the uniform act was intended to facilitate, rather than frustrate, that general rule. See id., 113–14.

---

[32] In *In re Fedder*, supra, 143 Cal. App. 2d 108–109, the court characterized the applicable provisions of the California Penal Code as substantially similar to the analogous provisions of the uniform act.

Accordingly, the court concluded that, under California law, Fedder was a fugitive from Idaho even though he had been removed involuntarily from that state under government compulsion. Id. Therefore, contrary to the determination of the Appellate Court, California case law does not support the view advanced by the petitioner that he is not subject to mandatory extradition under our version of the uniform act.[33]

One final case, namely, *Commonwealth ex rel. Bonomo* v. *Haas*, supra, 428 Pa. 167, is particularly instructive with respect to the issue of whether the petitioner is a fugitive from justice for whom extradition to Texas is mandatory. In that case, the petitioner, Dominick Bonomo, was convicted of various offenses in New Jersey and sentenced to a term of imprisonment. Id., 168. Bonomo eventually was released on parole. Id. Thereafter, however, he was convicted of a crime in New Jersey and sentenced to thirty days imprisonment. Id. In addition, his parole was revoked. Id. At the expiration of his thirty day sentence, New Jersey transferred Bonomo to the custody of the federal government to stand trial on a counterfeiting charge. Id. Upon doing so, New Jersey lodged a detainer against Bonomo with the federal correctional authorities. Id. Bonomo was convicted of the federal charges and sentenced to a term of imprisonment, which he served at a federal

---

[33] The petitioner also relies on *South Dakota* v. *Brown*, 20 Cal. 3d 765, 576 P.2d 473, 144 Cal. Rptr. 758 (1978), to buttress his contention that California case law interpreting California's version of the uniform act supports his claim that he is not a fugitive from Texas by virtue of his departure from Texas under compulsory process. The primary issue in *Brown*, however, was whether the courts of California were empowered to compel the governor of California to comply with a demand for mandatory extradition. See id., 767–68. In concluding that the courts lacked the authority to compel such compliance by the governor; see id., 771, 779–80; the court in *Brown* did not address the issue raised by this appeal, namely, whether the petitioner is properly treated as a fugitive notwithstanding his involuntary removal from the demanding state to this state. Consequently, *Brown* does not advance the petitioner's claim.

correctional institution in Pennsylvania. Id. Upon completion of his federal sentence, and in accordance with the detainer that had been lodged against him by New Jersey, Bonomo was arrested as a fugitive from justice by Pennsylvania authorities. Id. Thereafter, the governor of New Jersey filed a requisition with the governor of Pennsylvania for Bonomo's extradition to New Jersey, and the governor of Pennsylvania issued a warrant of extradition. Id.

Bonomo filed a petition for a writ of habeas corpus challenging the extradition warrant that had been issued by the governor of Pennsylvania. See id., 168–69. In support of his petition, Bonomo claimed, inter alia, that the warrant was invalid because he was not a fugitive from justice due to the fact that he had left New Jersey involuntarily. Id., 169. Upon application of Pennsylvania's statutes governing extradition—which, like our extradition statutes, are identical to the uniform act in all material respects; see id., 170; the habeas court rejected Bonomo's claim, and the Pennsylvania Supreme Court affirmed the judgment of the habeas court. See id., 167–68, 173. In construing the Pennsylvania statutes governing extradition, the Pennsylvania Supreme Court concluded that Bonomo's extradition was proper under § 2 of the Pennsylvania act;[34] see id., 173; which, like § 54-158 of our act, mandates the extradition of any person who, having been charged with a crime in the demanding state, "has fled from justice and is found in" the demanding state. (Internal quotation marks omitted.) Id., 170; accord General Statutes § 54-158. The court predicated its conclusion on the

---

[34] At the time that *Commonwealth ex rel. Bonomo* was decided, Pennsylvania's act governing extradition was codified at §§ 191.1 through 191.31 of title 19 of the Pennsylvania Statutes. Pa. Stat. Ann. tit. 19, §§ 191.1 through 191.31 (West 1964). Pennsylvania subsequently has relocated the act without substantive modification. See 42 Pa. Cons. Stat. Ann. § 9121 et seq. (West 1998). The numbering of the statutory provisions at issue in *Commonwealth ex rel. Bonomo* mirrors the numbering of the provisions of the uniform act.

fact that § 3 of the Pennsylvania act, which is identical in all material respects to § 54-159 of our act, expressly provides that all extradition demands except those made under § 6 of the Pennsylvania act—our § 54-162—shall contain the allegation that the subject of the demand "fled" from the demanding state. (Internal quotation marks omitted.) *Commonwealth ex rel. Bonomo* v. *Haas*, supra, 428 Pa. 171 n.2.

In reaching its conclusion, the Pennsylvania Supreme Court expressly acknowledged the language of § 5 of the Pennsylvania act, which, like § 54-161 of our act, speaks in permissive terms with respect to the extradition of persons who have left the demanding state involuntarily. The court made clear, however, that whatever the precise meaning of § 5, that section conflicts with the mandatory duty of the governor under § 3 of the Pennsylvania act, which, the court concluded, takes precedence over any discretionary authority purportedly vested in the governor under § 5.[35] Id. We agree with the conclusion of the Pennsylvania Supreme Court—and with the majority of other courts that have considered the issue—that a person who, like the petitioner, leaves the demanding state involuntarily under

---

[35] The court explained: "We agree . . . that extradition under the second paragraph of § 5 is not possible. That provision was obviously not well thought out, as indicated by its conflict with § 3. Fortunately, however, it is unnecessary to extradite under § 5, since § 2 covers the situations § 5 would cover." *Commonwealth ex rel. Bonomo* v. *Haas*, supra, 428 Pa. 170 n.2. As we have explained, the prefatory note to the uniform act and the commentary to § 5 thereof indicate that the purpose of the second paragraph of § 5 was to clarify, for those states whose courts had determined that persons leaving the demanding state involuntarily were nonfugitives who were not subject to mandatory extradition, that the governors of those states did, indeed, have the authority to extradite such persons. See Unif. Criminal Extradition Act prefatory note, supra, 11 U.L.A. 292; id., § 5, comment, 11 U.L.A. 464. Thus, although we agree with the Pennsylvania Supreme Court that the second paragraph of § 5 of the uniform act is confusing and that a literal reading of that provision places it in conflict with § 3, we do not believe that there is an actual conflict between the two provisions in light of the reason why the drafters included the second paragraph of § 5.

government compulsion is a fugitive from justice subject to the mandatory provisions of the act.[36]

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the habeas court.

In this opinion the other justices concurred.

---

[36] The Appellate Court did not quarrel with the reasoning of the Pennsylvania Supreme Court but, rather, sought to distinguish it. In endeavoring to do so, the Appellate Court explained that Pennsylvania had enacted a nonuniform version of the act that differs from our act. See *Clark* v. *Commissioner of Correction*, supra, 88 Conn. App. 190. In particular, the Appellate Court observed that, "Pennsylvania . . . has enacted a version of the act that prohibits Pennsylvania's governor from exercising discretion pursuant to § 5 because, except in cases involving § 6, it require[s] *all* extradition warrants to allege that the person sought fled from the demanding state. . . . The fact that, under Pennsylvania law, a governor does not have discretion to deny an extradition demand does not enlighten the proper interpretation of [our state counterpart to] § 5 . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id. On the contrary, our version of the uniform act and Pennsylvania's version of that act are the same in all relevant respects. Consequently, because *Commonwealth ex rel. Bonomo* is persuasive authority under the uniform act, it is persuasive for purposes of our act, as well.