# MARINELIS SENA, ADMINISTRATRIX (ESTATE OF TYRONE O. TILLMAN), ET AL. *v.* AMERICAN MEDICAL RESPONSE OF CONNECTICUT, INC., ET AL.
## (SC 19971)

Robinson, C. J., and Palmer, D'Auria, Mullins,
Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

Pursuant to statute (§ 28-13 [a]), "[n]either the state nor any political subdivision of the state . . . complying with or attempting to comply with [civil preparedness statutes] or any order or regulation promulgated pursuant to [those statutes] . . . shall be liable for the death of or injury to persons . . . as a result of any such activity."

The plaintiff, both individually and as administratrix of the estate of the decedent, T, sought to recover damages from, among others, the defendant city alleging, inter alia, that the city was negligent in responding to a medical emergency involving T. Specifically, the plaintiff alleged that the city had improperly failed to dispatch a fire truck with an emergency medical technician in response to T's emergency call and

Sena *v.* American Medical Response of Connecticut, Inc.

had impeded prompt arrival of an ambulance by allowing snow to remain in certain public roadways following a statewide winter snowstorm. Before the storm began, the city's mayor declared a state of emergency and activated the local emergency operations center. Shortly thereafter, the governor declared a statewide civil preparedness emergency pursuant to statute (§ 28-9). Snowfall during the storm was so significant that both city and state roads were temporarily closed to the public, and plowing and ambulance service were temporarily suspended. After the storm, clearing roads proved unusually difficult, and the city requested that the state summon the assistance of the National Guard, which arrived the following day. Two days after the storm concluded, only certain roads were open to emergency vehicles and several hundred secondary roads, including the road on which T lived, remained impassable. On that day, T called 911 complaining of severe breathing difficulty. An ambulance arrived approximately twenty minutes later and subsequently transported T to the hospital, where he was pronounced dead. Three days after the storm concluded, at least one lane was open on each of the city's roads. The city's emergency operations center maintained command over storm response and snow removal for approximately five days after the storm passed and remained staffed for approximately three days thereafter. More than one month later, the governor issued an executive order ending the statewide civil preparedness emergency. The plaintiff subsequently commenced the present action, and the city filed a motion for summary judgment, claiming immunity pursuant to § 28-13. The trial court denied that motion, concluding that there was a genuine issue of material fact as to whether the city was still actively experiencing a civil preparedness emergency at the time of the city's response to T's emergency call, and the plaintiff appealed. *Held*:

1. This court had subject matter jurisdiction over the city's appeal, as the trial court's denial of the city's motion for summary judgment constituted a final judgment because the city's motion was based on a colorable claim that § 28-13 (a) affords the city sovereign immunity from actions taken in response to declared emergencies; although the plain text of § 28-13 (a) does not clearly define the nature of the immunity afforded under that statute, an examination of relevant legislative history indicated that the legislature had intended that statute to extend the state's own sovereign immunity, including both its immunity from suit and liability, to political subdivisions such as the city.

2. The trial court improperly denied the city's motion for summary judgment on the basis of the court's conclusion that a genuine issue of material fact existed as to whether the city was still actively experiencing a civil preparedness emergency at the time of T's death, the trial court having incorrectly concluded that immunity under § 28-13 applies only during a civil preparedness emergency; the city's command and control of storm response and snow removal, including decisions regarding snow plowing and the circumstances in which a fire truck should respond to

Sena *v.* American Medical Response of Connecticut, Inc.

an emergency call, unambiguously fell within the statutory (§ 28-1 [4]) definition of civil preparedness, which explicitly includes measures taken in preparation of, during, and following major disasters and emergencies, and, therefore, evidence relating to whether the civil preparedness emergency had ended at the time of the city's response to T's emergency medical call did nothing to contradict the ample evidence in the record that the city was still engaged in activities afforded immunity by § 28-13 at that time.

Argued October 18, 2018—officially released September 3, 2019

*Procedural History*

Action to recover damages for, inter alia, the allegedly wrongful death of the named plaintiff's decedent as a result of the alleged negligence of the named defendant et al., and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Kamp, J.*, denied the motion for summary judgment filed by the defendant city of Bridgeport, and the defendant city of Bridgeport appealed. *Reversed*; *judgment directed.*

*J. Christopher Rooney*, with whom were *Alan Bowie* and, on the brief, *Anne Peterson*, for the appellant (defendant city of Bridgeport).

*Alan Scott Pickel*, with whom, on the brief, was *Anthony L. Cenatiempo*, for the appellees (plaintiffs).

*Opinion*

ROBINSON, C. J. This appeal requires us to consider the nature and scope of the immunity provided to the state and its political subdivisions by General Statutes § 28-13 (a)[1] for actions taken in connection with a civil

[1] General Statutes § 28-13 (a) provides: "Neither the state nor any political subdivision of the state nor, except in cases of wilful misconduct, the agents or representatives of the state or any political subdivision thereof nor any member of the civil preparedness forces of the state nor any person authorized by such civil preparedness forces or by any member of such civil preparedness forces complying with or attempting to comply with this chapter or any order or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state nor any person employed by or authorized to assist any agency of the

Sena *v.* American Medical Response of Connecticut, Inc.

preparedness emergency declared by the governor pursuant to General Statutes § 28-9,[2] which, in the present case, related to a blizzard that occurred in February, 2013. The defendant city of Bridgeport (city)[3] appeals[4] from the trial court's denial of its motion for summary judgment in the present case, which was commenced by the plaintiff, Marinelis Sena, both individually and as administratrix of the estate of Tyrone O. Tillman.[5] The operative complaint alleges, inter alia, that the city was negligent in (1) not following its usual practice of sending a fire truck with an emergency medical technician in addition to an ambulance to render medical care to Tillman when he experienced severe breathing difficulty on February 11, 2013, and (2) preventing the ambulance from arriving promptly by allowing snow to remain on certain public roadways. On appeal, the city claims, inter alia, that it was immune for its actions

federal government in the prevention or mitigation of any major disaster or emergency, shall be liable for the death of or injury to persons or for damage to property as a result of any such activity. The Attorney General shall appear for and defend the state, any political subdivision of the state and the agents or representatives of the state or any political subdivision thereof or any member of the civil preparedness forces of the state or any other person exempted from liability for his acts under this section in any civil action brought for the death of or injury to persons or for damage to property as a result of any civil preparedness activity."

[2] General Statutes § 28-9 (a) provides in relevant part: "In the event of serious disaster, enemy attack, sabotage or other hostile action or in the event of the imminence thereof, the Governor may proclaim that a state of civil preparedness emergency exists, in which event the Governor may personally take direct operational control of any or all parts of the civil preparedness forces and functions in the state. Any such proclamation shall be effective upon filing with the Secretary of the State. . . ."

[3] The plaintiff also named American Medical Response of Connecticut, Inc., and two of its employees, Brian Walts and William T. Ostroff, as defendants. These additional defendants are not participating in the present appeal.

[4] The city appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] For the sake of simplicity, we refer to Sena in both capacities as the plaintiff.

Sena *v.* American Medical Response of Connecticut, Inc.

pursuant to § 28-13, and that the trial court improperly determined that a genuine issue of material fact existed as to whether the civil preparedness emergency remained in effect on the date of Tillman's death. We conclude that (1) an appealable final judgment exists because the city's claims of immunity pursuant to § 28-13 implicate an extension of the state's sovereign immunity to the city, and (2) the trial court should have granted the city's motion for summary judgment because there was no genuine issue of material fact with respect to the applicability of § 28-13. Accordingly, we reverse the judgment of the trial court.

The record reveals the following relevant facts[6] and procedural history. On February 8 and 9, 2013, a blizzard, verified by the National Weather Service, occurred in nearly all of southern Connecticut. In anticipation of the blizzard, on February 7, 2013, at 1 p.m., representatives from the city's various departments and the local emergency preparedness board convened a meeting of the Bridgeport Emergency Planning Group, which was held at the city's emergency operations center (EOC). At that meeting, the members from the city's departments reviewed the city's emergency preparedness plan, designated representatives who would attend civil emergency planning sessions, and began to identify essential personnel who would be assigned during the expected emergency.

On February 8, 2013, beginning at 7 a.m., the city began to implement its emergency preparedness plan. Full operations at the EOC were initiated that morning, and numerous city officials conducted a conference

_____

[6] Given the summary judgment posture of this appeal, we present the facts in the light most favorable to the nonmoving party, which, in the present case, is the plaintiff. See, e.g., *Graham* v. *Commissioner of Transportation*, 330 Conn. 400, 414–15, 195 A.3d 664 (2018); *Glastonbury* v. *Metropolitan District Commission*, 328 Conn. 326, 337, 179 A.3d 201 (2018); *Doe* v. *West Hartford*, 328 Conn. 172, 191, 177 A.3d 1128 (2018).

Sena *v.* American Medical Response of Connecticut, Inc.

call with the statewide emergency operations center in order to ensure that the city's storm response was coordinated with the state's efforts. At 11 a.m., Mayor Bill Finch held a press conference and announced his intention to declare a civil preparedness emergency for the city, which included the institution of a citywide ban on driving so that plows could keep the roads clear. At 11:45 a.m., Governor Dannel Malloy held a press conference and declared a civil preparedness emergency pursuant to § 28-9.[7] Shortly thereafter, the EOC activated its response at level 4 and assumed centralized control over the city's response to the blizzard.[8]

By 5 p.m. on February 8, 2013, Governor Malloy had issued a statewide travel ban of all vehicles on any state road. By 8 p.m., snowfall was so severe that the EOC determined that it was unsafe for all vehicles other than

[7] A copy of Governor Malloy's letter to Secretary of the State Denise Merrill declaring a state of emergency pursuant to § 28-9 was attached as an exhibit to the city's motion for summary judgment. Governor Malloy ended that state of civil preparedness emergency and rescinded Executive Order 30, which also pertained to the February storm, on March 18, 2013, through Executive Order 33. Executive Order 33 also ended the civil preparedness emergency previously declared by Governor Malloy on October 27, 2012, in anticipation of Hurricane Sandy, and rescinded Executive Orders 21 through 28, which also pertained to Hurricane Sandy.

[8] An affidavit from Scott Appleby, the city's director of Emergency Management and Homeland Security, describes level 4 as "a 'full scale' response during which time the EOC takes complete control over the planning for and response to the emergency. . . . The goal at a full scale response is to centralize command and control over storm response in the hands of a unified command in one location. This group has overriding authority over department heads, who in general were sent home due to storm conditions. This control would include dispatching police, fire and ambulances in response to [911] calls. . . . Because the emergency call center is just down the hall, we have a supervisor from that area of the building permanently in the EOC room. In the case of this storm, Assistant Fire Chief Dominic Carfi (or his replacement) became the liaison with the call center and would give them instructions on how to handle calls. Occasionally, the supervisor from the emergency call center would come to us to discuss an issue or seek advice. The call center could also contact police and fire battalion chiefs by radio or telephone for instructions and an update on whether units could respond."

Sena *v.* American Medical Response of Connecticut, Inc.

plows to be on the city's roads. Whiteout conditions later that night required the recall of all plows. The EOC then restricted the response of municipal fire and police departments. Decisions regarding whether those departments would respond to reported emergencies were made by their representatives at the EOC, rather than by emergency communications employees. William Schietinger, the representative at the EOC from the city's ambulance contractor, American Medical Response of Connecticut, Inc. (AMR), similarly suspended ambulance service temporarily because of whiteout conditions. As visibility improved, the EOC decided that AMR could resume providing ambulance service, and, at 3 a.m. on February 9, 2013, plows returned to the streets.

Beginning midday on February 9, 2013, the EOC shifted its attention from storm response to snow removal. The snow removal process was unusually difficult because snow accumulation reached a level higher than the typical dump truck with plow attached could move, and many cars had not been removed from public streets, despite the parking bans in effect. This resulted in vehicles having to be dug out and towed before streets could be plowed. Because of the substantial snow accumulation, the EOC requested that the state send national guard personnel and equipment to assist with snow removal and emergency responses. That additional snow removal equipment did not begin to arrive until February 10, 2013. Given the paralyzing snow accumulation, most of the city's residents were confined to their homes.

The limited ability of the fire and police departments to respond to calls for assistance continued in the wake of the storm because most police and fire stations had not yet dug out. On February 10, 2013, at 2 a.m., Brian Rooney, the city's fire chief, and Dominic Carfi, a deputy fire chief who had been the fire department's represen-

Sena *v.* American Medical Response of Connecticut, Inc.

tative at the EOC during the storm, determined that, in the case of medical emergencies, the only response would be through AMR because it was not physically possible for the city's fire trucks to leave the stations. Carfi conveyed that decision to the city's 911 emergency communications employees via their supervisor. Once fire headquarters was cleared of snow by approximately 10 a.m. that day, the fire department was able to use a limited number of four wheel drive sport utility vehicles that could be driven on plowed streets to respond to emergencies. In consultation with AMR's representative in the EOC, a deputy fire chief who had relieved Carfi would authorize the dispatch of one of these sport utility vehicles to emergency medical calls depending on road conditions, the location of the call, and the severity of the medical condition.

On Monday, February 11, 2013, twelve front end loaders arrived and provided assistance in the clearing of the city's primary roads. However, city offices remained closed, no regular city employees reported for work, and schools would remain closed for the remainder of the week. As of 8 p.m. that day, a citywide driving ban remained in effect, and only 100 roads were open to emergency vehicles. Most of those were primary roads. Several hundred secondary roads were still closed or impassible, and tow trucks were still in the process of removing abandoned vehicles.

At approximately 7:18 p.m. on February 11, 2013, Tillman called 911 complaining of severe breathing difficulty. At 7:27 p.m., AMR dispatched an ambulance to assist Tillman. The fire department did not respond. According to an affidavit submitted by Scott Appleby, the city's Director of Emergency Management and Homeland Security, Stevens Street, on which Tillman lived, had not yet been plowed at that time. Brian Walts and William T. Ostroff, emergency medical technicians employed by AMR, reached Tillman at 7:36 p.m. and

Sena *v.* American Medical Response of Connecticut, Inc.

rendered emergency care until 8:04 p.m. Tillman was subsequently transported to a local hospital, where he was pronounced dead upon arrival.

The efforts to clear at least one lane on each of the city's roads continued until February 12, 2013. It took an additional week for the city's roads to be cleared to the point where traffic could pass normally. The EOC maintained command over storm response and snow removal through February 14, 2013, after which operational control over the various city departments, including the fire department, was returned to the normal operating procedure. The EOC remained staffed and active through February 17, 2013, at which point the operational period ended, the response was terminated, and the EOC was vacated by all personnel except Appleby.

The plaintiff subsequently brought the present action against the city, AMR, Ostroff, and Walts. In counts twenty and twenty-one of the operative complaint, the plaintiff claims the city negligently failed to follow the local emergency service plan and permitted a highway defect to exist pursuant to General Statutes § 13a-149. On September 27, 2016, the city moved for summary judgment on immunity grounds. On November 16, 2016, the plaintiff filed an objection to that motion together with an accompanying memorandum of law.

On March 8, 2017, the trial court issued a memorandum of decision denying the city's motion for summary judgment. The trial court first rejected the city's argument that the present action is barred by common-law governmental immunity. The trial court next addressed the city's argument that it is absolutely immune from liability pursuant to § 28-13. The trial court concluded that, although the city had met its initial burden of producing evidence sufficient to support a judgment in its favor on the issue of § 28-13 immunity, the plaintiff

333 Conn. 30 SEPTEMBER, 2019 39

Sena *v.* American Medical Response of Connecticut, Inc.

had submitted evidence contradicting the city's evidence concerning whether the city was still experiencing a civil preparedness emergency at the time of Tillman's death. The trial court also observed that the relevant statutes do not prescribe how to determine when an emergency has ended for purposes of § 28-13 immunity and suggested that a "workable 'end date' is needed." Accordingly, the trial court concluded that, on the basis of the evidence before it, the city could not invoke the protections of § 28-13 immunity because a genuine issue of material fact existed as to whether the city was still actively experiencing a civil preparedness emergency at the time of Tillman's death. This appeal followed. See footnote 4 of this opinion.

On appeal, the city argues that the trial court incorrectly concluded that the end date of a civil preparedness emergency has statutory significance under § 28-13, and incorrectly concluded that there was a genuine issue of material fact concerning the issue of § 28-13 immunity. The plaintiff disagrees and also argues that the trial court's denial of the city's motion for summary judgment does not constitute an appealable final judgment.

I

As a threshold issue, we must determine whether the trial court's denial of the city's motion for summary judgment is a final judgment over which we have subject matter jurisdiction.[9] Relying on *Shay* v. *Rossi*, 253 Conn. 134, 749 A.2d 1147 (2000), overruled on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 828 A.2d 549 (2003), the city argues that there is an appealable final

_____

[9] Prior to oral argument in this appeal, we ordered, sua sponte, that the parties file supplemental briefs addressing the following question: "Is the order denying the . . . city's motion for summary judgment, which claimed that the city was immune from liability pursuant to . . . § 28-13 (a), a final judgment such that the Supreme Court has jurisdiction over the appeal? See *Vejseli* v. *Pasha*, [282 Conn. 561, 923 A.2d 688] (2007)."

Sena *v.* American Medical Response of Connecticut, Inc.

judgment because its motion for summary judgment was grounded on a colorable claim that § 28-13 grants the city and its police and fire departments sovereign immunity for actions taken in response to declared emergencies. In response, the plaintiff relies on *Vejseli* v. *Pasha*, 282 Conn. 561, 923 A.2d 688 (2007), and contends that we lack jurisdiction over the city's appeal because the city's motion for summary judgment under § 28-13 was founded on governmental, rather than sovereign, immunity. Additionally, the plaintiff argues that an issue of material fact still exists regarding whether the city was undergoing a state of emergency at the time of Tillman's death and, thus, whether the immunity afforded by the statute applies. We agree with the city and conclude that the trial court's denial of its motion for summary judgment was an appealable final judgment because § 28-13 extends the state's sovereign immunity to political subdivisions, such as municipalities.

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter jurisdiction is a question of law [and, therefore] our review is plenary. . . .

"Neither the parties nor the trial court . . . can confer jurisdiction upon [an appellate] court. . . . The right of appeal is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met. . . . It is equally axiomatic that, except insofar as the legislature has specifically provided for an interlocutory appeal or other form of interlocutory appellate review . . . appellate jurisdiction is limited to final judgments of the trial court." (Citation omitted; internal quotation marks omitted.) *Ledyard* v.

Sena *v.* American Medical Response of Connecticut, Inc.

*WMS Gaming, Inc.*, 330 Conn. 75, 84, 191 A.3d 983 (2018); see also General Statutes § 52-263.[10]

"As a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case. . . . We previously have determined [however] that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under . . . § 52-263. . . . In *State* v. *Curcio*, [191 Conn. 27, 31, 463 A.2d 566 (1983)], we explicated two situations in which a party can appeal an otherwise interlocutory order: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them.[11] . . .

"The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [party] irreparably harmed unless they may immediately appeal. . . . Thus, a bald assertion that the defendant will be irreparably harmed if appellate review is delayed until final adjudication . . . is insufficient to make an otherwise interlocutory order a final judgment. One must make at least a colorable claim that some recognized statutory or constitutional right is at risk. . . .

_____

[10] General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

[11] Neither party argues that the first prong of the *Curcio* test is applicable to the present appeal.

Sena *v.* American Medical Response of Connecticut, Inc.

"In *Shay* v. *Rossi*, supra, 253 Conn. 165–67, we concluded that [t]he nature of sovereign immunity is such a right. It protects the state, not only from ultimate liability for alleged wrongs, but also from being required to litigate whether it is so liable. Therefore, unless the state is permitted to appeal a trial court's denial of its motion to dismiss, filed on the basis of a colorable claim of sovereign immunity, the state's right not to be required to litigate the claim filed against it would be irretrievably lost.

"We have in the past phrased the underlying rationale of the doctrine of sovereign immunity in theoretical terms. For example, in *Horton* v. *Meskill*, 172 Conn. 615, 623–24, 376 A.2d 359 (1977), we noted, as . . . Justice [Oliver Wendell Holmes, Jr.] wrote: A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends. . . . The modern rationale for the doctrine, however, rests on the more practical ground that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property. . . . This rationale suggests that the doctrine protects the state from unconsented to litigation, as well as unconsented to liability.

"Although we have never explicitly delineated this particular aspect of the doctrine in final judgment terms, our sovereign immunity cases implicitly have recognized that the doctrine protects against suit as well as liability—in effect, against having to litigate at all. In *Bergner* v. *State*, 144 Conn. 282, 286, 130 A.2d 293 (1957), we recognized the distinction between immunity from suit and from liability, and held that a statutory waiver of sovereign immunity constituted a

Sena *v.* American Medical Response of Connecticut, Inc.

waiver of suit and provided a remedy to enforce such liability as the general law recognizes. . . . [T]he state's waiver of its immunity from liability only arises after a prior determination that it has waived its immunity from suit, and that a waiver of immunity from suit does not necessarily imply a waiver of immunity from all aspects of liability.

"Thus . . . the state's sovereign immunity right not to be required to litigate at all, as opposed to its right not to be ultimately subjected to liability, is analogous to that facet of the criminal defendant's constitutional double jeopardy right not to be tried twice for the same offense. Because that constitutional right includes the right not even to be tried for the same offense, the denial of a motion to dismiss criminal charges, filed on the basis of a colorable claim of double jeopardy, is an immediately appealable final judgment under the second prong of *Curcio*. . . . Similarly, therefore, in a civil case the denial of a motion to dismiss, filed on the basis of a colorable claim of sovereign immunity, must be regarded under *Curcio* as an immediately appealable final judgment." (Citation omitted; footnotes added and omitted; internal quotation marks omitted.) *Vejseli* v. *Pasha*, supra, 282 Conn. 568–71; see also *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865 A.2d 1163 (2005) (partial denial of defendants' motion for summary judgment, which had colorable claim of absolute immunity for participation in judicial and quasi-judicial proceedings, constituted appealable final judgment for same reason that rejection of colorable claim of sovereign immunity gives rise to immediately appealable final judgment, namely, to protect against threat of suit).

Within our final judgment jurisprudence, we have held that judgments affecting a right of governmental immunity are treated differently under the second prong of *Curcio* than those affecting a right of sovereign

Sena *v.* American Medical Response of Connecticut, Inc.

immunity. "[W]hereas [t]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss . . . the doctrine of governmental immunity implicates no such interest. . . . Indeed, we expressly have recognized that, [u]nlike the state, municipalities have no sovereign immunity from suit. . . . Rather, municipal governments have a limited immunity from liability. . . .

"Governmental immunity, which applies to municipalities, is different in historical origin, scope and application from the sovereign immunity enjoyed by the state. A suit against a municipality is not a suit against a sovereign. Towns have no sovereign immunity, and are capable of suing and being sued . . . in any action. . . . Municipalities do, in certain circumstances, have a governmental immunity from liability. . . . But that is entirely different from the state's sovereign immunity from suit. . . . Accordingly . . . municipalities are immune from liability only, and not from suit. . . .

"Because municipalities are immune from liability, but not from suit, the concerns that justify the availability of an immediate appeal from the denial of a motion to dismiss based on sovereign immunity are not implicated in the context of governmental immunity. Put differently, municipalities have no immunity from suit that potentially might be rendered meaningless without the opportunity for immediate appellate review before being forced to defend, even successfully, a case at trial. . . . Accordingly . . . the denial of a motion to dismiss or to strike based on governmental immunity is not an appealable final judgment under the second prong of *Curcio*." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *Vejseli* v. *Pasha*, supra, 282 Conn. 572–75.

In contrast to *Shay*, a case in which there was no dispute that the defendants' claim of sovereign immu-

Sena *v.* American Medical Response of Connecticut, Inc.

nity was colorable; *Shay* v. *Rossi*, supra, 253 Conn. 168;
the parties in the present case disagree as to whether
the city has presented a colorable claim of sovereign
immunity. In determining whether a claim is colorable
for purposes of whether a "decision constitutes a final
judgment that provides this court with jurisdiction to
consider the merits of that decision," we emphasize
that a "colorable claim is one that is superficially well
founded but that may ultimately be deemed invalid
. . . ." (Internal quotation marks omitted.) *BNY West-
ern Trust* v. *Roman*, 295 Conn. 194, 209, 990 A.2d 853
(2010). "For a claim to be colorable, the defendant need
not convince the . . . court that he necessarily will
prevail; he must demonstrate simply that he *might* pre-
vail." (Emphasis in original; internal quotation marks
omitted.) *In re Santiago G.*, 325 Conn. 221, 231, 157
A.3d 60 (2017).

Although it is now axiomatic that a political subdivi-
sion may not ordinarily claim sovereign immunity as a
defense to a claim against it; see, e.g., *Vejseli* v. *Pasha*,
supra, 282 Conn. 572; the city contends that the trial
court's denial of its motion for summary judgment is
an appealable final judgment because § 28-13 extends
to it the state's sovereign immunity under the circum-
stances of this case. We, therefore, turn to § 28-13 to
determine the nature of the immunity afforded to politi-
cal subdivisions. This presents a question of statu-
tory construction.

"When construing a statute, [o]ur fundamental objec-
tive is to ascertain and give effect to the apparent intent
of the legislature. . . . In other words, we seek to
determine, in a reasoned manner, the meaning of the
statutory language as applied to the facts of [the] case,
including the question of whether the language actually
does apply. . . . In seeking to determine that meaning,
General Statutes § 1-2z directs us first to consider the
text of the statute itself and its relationship to other

Sena *v.* American Medical Response of Connecticut, Inc.

statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation.'' (Internal quotation marks omitted.) *In re Henrry P. B.-P.*, 327 Conn. 312, 324–25, 173 A.3d 928 (2017).

We begin with the text of § 28-13 (a), which provides: ''Neither the state *nor any political subdivision* of the state nor, except in cases of wilful misconduct, the agents or representatives of the state or any political subdivision thereof nor any member of the civil preparedness forces of the state nor any person authorized by such civil preparedness forces or by any member of such civil preparedness forces complying with or attempting to comply with this chapter or any order or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state nor any person employed by or authorized to assist any agency of the federal government in the prevention or mitigation of any major disaster or emergency, shall be liable for the death of or injury to persons or for damage to property *as a result of any such activity*. The Attorney General shall appear for and defend the state, *any political subdivision of the state* and the agents or representatives of the state or any political subdivision thereof or

Sena *v.* American Medical Response of Connecticut, Inc.

any member of the civil preparedness forces of the state or any other person exempted from liability for his acts under this section in any civil action brought for the death of or injury to persons or for damage to property *as a result of any civil preparedness activity*.'' (Emphasis added.)

By its plain language, the statute provides that several actors, including political subdivisions of the state, shall not be ''liable for the death of or injury to persons or for damage to property as a result of any such activity.'' ''[S]uch activity'' refers to ''complying with or attempting to comply with this chapter or any order or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state . . . .'' General Statutes § 28-13 (a). The statute unambiguously provides immunity to political subdivisions for death or injury to persons that result from, inter alia, attempted compliance with chapter 517 of the General Statutes. What is unclear from the plain language of the statute, however, is the nature of that immunity. Because the statute uses the word ''liability,'' it could reasonably be interpreted as implicating governmental immunity— an immunity from liability, but not from suit. But the statute could also reasonably be read as conferring statutory immunity akin to sovereign immunity—an immunity from suit as well as liability. That reading finds support in the second half of § 28-13 (a), which requires the attorney general to ''appear for and defend'' political subdivisions. That dedication of state resources in the form of representation by the attorney general to matters typically handled by the corporation counsel of a political subdivision can reasonably be read as an attempt to shield political subdivisions from the cost and defense of lawsuits altogether. Because the statute is susceptible to more than one reasonable

Sena *v.* American Medical Response of Connecticut, Inc.

interpretation, we conclude that it is ambiguous and, therefore, consider extratextual evidence of legislative intent, including the statute's legislative history and the policy objectives the statute was intended to implement. See *In re Henrry P. B.-P.*, supra, 327 Conn. 324–25.

The relevant legislative history, although scant, supports the city's argument that § 28-13 immunity constitutes an extension of sovereign immunity to political subdivisions. The statutory scheme at issue, which was originally enacted in 1949, addressed civil defense concerns and contemplated new forms of warfare, including the atomic bomb. See Conn. Joint Standing Committee Hearings, Judiciary, 1950 Spec. Sess., pp. 6–7. Wesley A. Sturges, a former administrator of the State Defense Council, testified before the Judiciary Committee during a 1950 public hearing concerning the reenactment of the statutory scheme, and opined as follows on the issue of immunity: "My other suggestion concerns [the provision of the] bill which has to do with granting of immunity to personnel engaged in Civil Defense Service and except for cases of [wilful] misconduct there should be no liability as to tort liability or under the [c]ivil [d]efense law. I recommend you consider that the [s]tate and political subdivisions make available defense counsel for these personnel members. It is well to say he shall not be liable for acts necessary in performance of duty but the opportunity for suit still obtains. When a suit is brought against me it costs me money and I believe it is worthy of consideration as a check for costs and payment for services." Id., pp. 7–9. Sturges' testimony highlighted the concern that suits might still be brought against civil defense personnel by requesting that the cost of representation in such a suit be borne by the state, effectively protecting personnel from one of the key costs of litigation. This testimony suggests that the legislature intended the lan-

Sena *v.* American Medical Response of Connecticut, Inc.

guage at issue to address the difficulties faced by civil defense personnel as a result of such suits, even in cases in which people are ultimately immune from liability, thus indicating that the early intent of the legislation was to provide immunity from suit altogether.[12] See *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003) ("[I]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." [Internal quotation marks omitted.]); see also, e.g., *State* v. *Bush*, 325 Conn. 272, 290–91, 157 A.3d 586 (2017); *Commissioner of Public Safety* v. *Freedom of Information Commission*, 301 Conn. 323, 351 and n.11, 21 A.3d 737 (2011).

Legislative history from debates on certain alterations to the statutory scheme in 1979 resolves any lingering questions as to the legislature's intentions. In 1979, the legislature aligned the definitions of state law with the federal statutory scheme, in order to allow for a seamless response from federal, state, and local forces under a unity of command.[13] On the immunity provision

[12] Although this testimony could also be read to suggest that the early intent of the legislation was merely to provide immunity from liability, given that Sturges appears to have suggested that the opportunity for suit "still obtains," we decline to adopt such a reading because there is no colloquy suggesting that Sturges used "liability" and "suit" as terms of art, as contemplated by subsequent case law. This buttresses our more purposive interpretation of his testimony.

[13] The proponent of the relevant bill in the House of Representatives, Representative Michael R. Colucci, described the change as follows: "The intent of this bill is to align the [s]tate laws with the [f]ederal laws. The Disaster Relief Act of [1974] . . . has become the guideline in dealing with natural disasters and [General Statutes (Rev. to 1979) § 28-1] is amended by the addition of 'or a disaster' following the phrase 'by any such attack.' This is added purely for clarification purposes. Further, [the bill] inserts

Sena *v.* American Medical Response of Connecticut, Inc.

specifically, a proponent of the relevant bill in the Senate, Senator Clifton A. Leonhardt, remarked: "[W]hat this [b]ill basically would do is bring certain aspects of our [c]ivil [p]reparedness [s]tatutes into line with federal statutes and federal guidelines in five areas. First of all, the [b]ill would distinguish between major disasters on the one hand and emergencies on the other so that the [state] could qualify for federal aid in emergencies that are less than federal disasters; less than major disasters. *It would also clarify that civil preparedness personnel, including federal employees, are protected from liability for actions related to their civil preparedness actions.*" (Emphasis added.) 22 S. Proc., Pt. 7, 1979 Sess., p. 2121. Senator Leonhardt then expanded on what it meant to be "protected from liability" in an exchange with Senator Russell Lee Post, Jr.

"Senator Post: [Am] I correct Senator Leonhardt, that a person now who is authorized by the [s]tate as the result of a snowstorm occurring anywhere in the country, could come onto your property . . . and do damage, and *you would not have the right to sue them*? . . .

"Senator Leonhardt: As long as they are executing a civil preparedness function and they're not engage in a situation of [wilful] misconduct. That's the case. . . .

"Senator Post: If a person . . . is authorized by the [s]tate [and] comes onto your property and does damage, *it's not that that person is held harmless by the [s]tate and would recover any expenses of suit, but rather the property owner under this, has no recourse against the [s]tate or the town or any local official, operating under this [provision]?* Is that correct?

two new definitions for major disasters and emergency, while repealing the old definition for disaster. Again, this is done to align [f]ederal and [s]tate legislation. Having [f]ederal and [s]tate legislation say the same thing facilitates the administration of these laws." 22 H.R. Proc., Pt. 5, 1979 Sess., p. 1648.

Sena *v.* American Medical Response of Connecticut, Inc.

"Senator Leonhardt: [*That*] *is correct. And I think this is very much in keeping with the long-standing tradition that in situations of civil emergency, the* [*s*]*tate has certain extraordinary powers that have to be executed and this statute is not changing the concept there at all*, except to extend it to federal officials who are assisting the [s]tate. *We're really building on a very long-time, well established concept and only saying that the same, very same concepts that we, for a long time had for local and state officials we're now going to extend to federal officials* who come into the [s]tate . . . at our request, to help us in times of civil emergency." (Emphasis added.) Id., pp. 2127–29.

This colloquy establishes that the bill's proponent in the Senate believed that the statute, as it previously existed, included the "very long-time, well established concept" that the immunity provided in the statute was immunity from suit and not from liability alone. Given the ambiguity of the statutory text, this language suggests that the legislature intended to provide to certain federal officials the same immunity from suit that it believed political subdivisions already enjoyed under the statute. Moreover, this construction is consistent with the purpose of the 1979 amendments to the statute, namely, bolstering a seamless unity of command whereby political subdivisions and local officials may be effectively conscripted into service on the state's behalf at the order of the governor. In such a situation, it is entirely reasonable that the legislature would wish to provide these local actors with the same immunity from suit that the state itself enjoys. See, e.g., *Cahill* v. *Board of Education*, 187 Conn. 94, 101–102, 444 A.2d 907 (1982) (municipal boards of education are "agents of the state responsible for education in the towns" entitled to sovereign immunity if board's "action would operate to control the activities of the state or subject it to liability"); see also *Vejseli* v. *Pasha*, supra, 282

52 SEPTEMBER, 2019 333 Conn. 30

Sena *v.* American Medical Response of Connecticut, Inc.

Conn. 575 n.12. Although the city does not possess common-law sovereign immunity, it is clear from the salient legislative history that the legislature intended for § 28-13 to provide political subdivisions, like the city, with immunity from suit and not just immunity from liability. We conclude, therefore, that § 28-13 extends the state's sovereign immunity, including both its immunity from suit and liability, to political subdivisions. Accordingly, we further conclude that the city has a colorable claim of sovereign immunity, and, therefore, the trial court's denial of the city's motion for summary judgment constitutes a final judgment over which we have jurisdiction.

II

We now consider whether the trial court properly denied the city's motion for summary judgment on the basis of its determination that a genuine issue of material fact existed as to whether the civil preparedness emergency was still in effect on the date of the allegations of the plaintiff's complaint. The city's principal contentions are that the trial court improperly construed the statutes at issue and that the dispute of fact identified by the trial court, namely, whether the civil preparedness emergency was still in effect, is not a dispute of *material* fact. The plaintiff argues in response that the trial court properly construed the statutes, insofar as the city's failures to follow its local emergency service plan and to clear its roads are not activities for which the city is afforded immunity under § 28-13, and that, even if such activities are covered by § 28-13, the trial court correctly concluded that an issue of material fact still exists. We conclude that the trial court improperly construed the nature and scope of § 28-13 immunity and also incorrectly determined that there remains a genuine issue of material fact pertaining to the application of § 28-13 immunity.

Sena *v.* American Medical Response of Connecticut, Inc.

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle[s] him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy [this] burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . As the burden of proof is on the movant, the evidence must be viewed in the light most favorable to the opponent. . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book [§ 17-45] . . . . Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co.* v. *Tully*, 322 Conn. 566, 573, 142 A.3d 1079 (2016).

Given our conclusion in part I of this opinion that § 28-13 represents an extension of the state's sovereign immunity to political subdivisions, we note that it is well established that "[s]overeign immunity relates to a court's subject matter jurisdiction over a case, and therefore presents a question of law over which we

Sena *v.* American Medical Response of Connecticut, Inc.

exercise de novo review. . . . In so doing, we must decide whether [the trial court's] conclusions are legally and logically correct and find support in the facts that appear in the record.'' (Internal quotation marks omitted.) *Markley* v. *Dept. of Public Utility Control*, 301 Conn. 56, 64–65, 23 A.3d 668 (2011). Accordingly, our standard of review over the trial court's legal construction of the statutory immunity provided for in § 28-13 is plenary.

As previously stated, our construction of a statute is governed by § 1-2z. See, e.g., *In re Henry P. B.-P.*, supra, 327 Conn. 324–25. As we observed in part I of this opinion, by its plain language, § 28-13 (a) provides a number of actors, including political subdivisions of the state, with immunity from suit ''for the death of or injury to persons or for damage to property *as a result of any such activity*,'' with ''such activity'' defined as ''complying with or attempting to comply with this chapter or any order or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state . . . .'' (Emphasis added.) General Statutes § 28-13 (a). The statute unambiguously affords political subdivisions immunity for death or injury to persons that *result* from the ''activity'' delineated in § 28-13.

Our conclusion that this ''activity'' includes the EOC's command and control of storm response and snow removal, as well as decisions made during that process, such as those regarding which streets to plow and whether to send a fire truck in response to an emergency, finds further support in the plain text of § 28-13 (a). The first sentence of § 28-13 (a) immunizes political subdivisions, such as the city, from suit for the ''death of or injury to persons or for damage to property'' that results from ''complying with or attempting to comply with this chapter or any order or regulation promul-

Sena *v.* American Medical Response of Connecticut, Inc.

gated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state . . . .'' The second sentence of § 28-13 (a) executes the immunity provided by the first sentence by requiring the attorney general to ''appear for and defend'' those entities and individuals described in the first sentence ''in any civil action brought for the death of or injury to persons or for damage to property as a result of any *civil preparedness activity*.'' (Emphasis added.)

General Statutes § 28-1 (4) defines civil preparedness broadly to include ''*all those activities and measures designed or undertaken* (A) *to minimize or control the effects upon the civilian population of major disaster or emergency*, (B) to minimize the effects upon the civilian population caused or which would be caused by an attack upon the United States, (C) *to deal with the immediate emergency conditions which would be created by any such attack, major disaster or emergency*, and (D) to effectuate emergency repairs to, or the emergency restoration of, vital utilities and facilities destroyed or damaged by any such attack, major disaster or emergency. *Such term shall include, but shall not be limited to, (i) measures to be taken in preparation for* anticipated attack, major disaster or emergency, including the establishment of appropriate organizations, operational plans and supporting agreements; the recruitment and training of personnel; the conduct of research; the procurement and stockpiling of necessary materials and supplies; the provision of suitable warning systems; the construction and preparation of shelters, shelter areas and control centers; and, when appropriate, the nonmilitary evacuation of the civilian population, pets and service animals; (ii) *measures to be taken during* attack, major disaster or emergency, including the enforcement of passive defense regula-

Sena *v.* American Medical Response of Connecticut, Inc.

tions prescribed by duly established military or civil authorities; the evacuation of personnel to shelter areas; the control of traffic and panic; and the control and use of lighting and civil communication; and (iii) *measures to be taken following* attack, major disaster or emergency, *including activities for firefighting; rescue, emergency medical, health and sanitation services*; monitoring for specific hazards of special weapons; unexploded bomb reconnaissance; essential debris clearance; emergency welfare measures; and immediately essential emergency repair or restoration of damaged vital facilities.'' (Emphasis added.) The scope of activity included within § 28-13 is broad, as the types of activity listed in § 28-1 (4) include, but are not limited to, measures to be taken "in preparation for," "during," and "following" a major disaster or emergency.[14] General Statutes § 28-1 (4). Measures undertaken "to minimize or control the effects upon the civilian population of major disaster or emergency" and measures taken "following [a] major disaster or emergency," such as "activities for firefighting" and "rescue, emergency medical, health and sanitation services"; General Statutes § 28-1 (4); unambiguously include the EOC's command and control of storm response and snow removal, as well as decisions made during that process, such as decisions regarding which roads to clear and the circumstances in which a fire truck should respond to an emergency call.

The trial court concluded, however, that § 28-13 affords various state entities immunity from liability

---

[14] In emphasizing the breadth of the immunity afforded by § 28-13, we note that the activity prescribed by the statute includes "complying with *or attempting to comply with* this chapter or any order or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state . . . ." (Emphasis added.) Our broad interpretation of § 28-13 immunity is bolstered by the legislature's decision to immunize political subdivisions for even *attempting* to comply with the statutory scheme at issue.

only *during* a civil preparedness emergency. In so concluding, the trial court relied on the catchline of § 28-13: "Immunity from liability. Penalty for denial of access to property during civil preparedness emergency." We observe, however, that catchlines such as this one "are prepared, and from time to time changed, by the Revisors [of the General Statutes] and are intended to be informal brief descriptions of the contents of the [statutory] sections. . . . These boldface catchlines should not be read or considered as statements of legislative intent since their sole purpose is to provide users with a brief description of the contents of the sections." Preface to the General Statutes, p. vii; see also *Clark* v. *Commissioner of Correction*, 281 Conn. 380, 389 n.14, 917 A.2d 1 (2007). We conclude, therefore, that the trial court incorrectly concluded that § 28-13 immunity applies only *during* a civil preparedness emergency. Instead, as we have discussed, § 28-13 immunity, by the plain language of the statute, applies to the activities discussed in the statute, which include measures to be taken "in preparation for," "during," and "following" a major disaster or emergency. General Statutes § 28-1 (4).

Despite its construction of the statute, the trial court nevertheless concluded that the city had "met its [initial] burden of putting forth evidence sufficient to support a judgment in its favor on the ground of § 28-13 (a) immunity" and pointed to the following evidence to support its conclusion: (1) evidence showing that a civil preparedness emergency was declared for the state by Governor Malloy pursuant to § 28-9, and for the city by Mayor Finch, on February 8, 2013; (2) the testimony of Appleby that the EOC was in full operation by 8 a.m. on February 8, 2013, despite neither Governor Malloy's nor Mayor Finch's having yet officially declared a civil preparedness emergency; (3) evidence showing that, although snow stopped falling around noon on February

Sena *v.* American Medical Response of Connecticut, Inc.

9, 2013, the EOC retained command and control of storm response and snow removal through February 14, 2013, and remained staffed and active through February 17, 2013, when the operational period ended, response was terminated, and the office was vacated by all personnel except Appleby; (4) a declaration from the United States Department of Homeland Security's Federal Emergency Management Agency that federal disaster aid had been made available to the state to supplement state, tribal, and local recovery efforts in the area affected by a severe winter storm and snowstorm from February 8 through 11, 2013; (5) evidence demonstrating that the relevant "incident period" occurred between February 8 and 12, 2013, and that a "major disaster" had been declared on March 21, 2013; and (6) the testimony of Brenda M. Bergeron, principal attorney for the Division of Emergency Management and Homeland Security within the Connecticut Department of Emergency Services and Public Protection, that Governor Malloy's declaration of a civil preparedness emergency was still in effect on February 11 and 12, 2013, and was not formally revoked until March 18, 2013, pursuant to Executive Order No. 33.

The trial court observed, however, that "the plaintiff has presented evidence contradicting the [city's] evidence with respect to whether [it] was still experiencing a civil preparedness emergency, for purposes of § 28-13 (a) immunity, at the time of [Tillman's] death." As contradicting evidence, the trial court cited the following: (1) "[w]ith respect to Mayor Finch's declaration, Appleby initially testified that he believe[d] it was revoked on February 16, 2013, but then subsequently stated that the EOC time line for the operational period designated a termination of the emergency operations response on February 17, 2013," and also testified "that he was unaware of any official declaration by [Mayor Finch] revoking the state of emergency"; (2) "with

Sena *v.* American Medical Response of Connecticut, Inc.

respect to the city's . . . fire response protocol during the period in question, Appleby testified that, late in the day on February 8, 2013, the EOC issued a directive . . . that response of the police and fire departments would be restricted,'' Carfi testified ''that the fire response protocol restriction was lifted prior to the evening of February 11, 2013,'' and Rooney testified that ''fire engines and fire trucks could get out and respond to calls [on February 11, 2013], if necessary.'' (Internal quotation marks omitted.) We conclude that none of these facts is ''[a] material fact . . . which will make a difference in the result of the case.'' (Internal quotation marks omitted.) *Doe* v. *West Hartford*, 328 Conn. 172, 191–92, 177 A.3d 1128 (2018).

First, with respect to Appleby's testimony regarding the revocation of Mayor Finch's declaration, any dispute concerning the date of the revocation is not material because February 16 and 17, 2013, both came *after* the events at issue in this case. Most saliently, the revocation of Mayor Finch's declaration does nothing to dispute the ample evidence in the record showing that the city was ''complying with or attempting to comply with [the civil preparedness statutes] or any order or regulation promulgated pursuant to the [the civil preparedness statutes]'' on the date that the conduct at issue occurred. Specifically, the record contains evidence that the EOC retained command and control of storm response and snow removal through February 14, 2013, and remained staffed and active through February 17, 2013, evidence that a civil preparedness emergency was ongoing at that time pursuant to Governor Malloy's declaration, and evidence that efforts to clean city roads continued until at least February 12, 2013. Second, whether the partial lifting of the fire response protocol restriction occurred prior to the date of the allegations in the plaintiff's complaint likewise does not give rise to a material fact because that distinction does

Sena *v.* American Medical Response of Connecticut, Inc.

nothing to contradict the ample evidence in the record that the city was still engaged in activities afforded immunity by § 28-13 on the date relevant to the plaintiff's allegations. Consequently, we conclude that the trial court incorrectly concluded that the city had failed to meet its ultimate burden of showing the absence of a genuine issue of material fact. The trial court, therefore, improperly denied the city's motion for summary judgment.[15]

The judgment is reversed and the case is remanded with direction to grant the city's motion for summary judgment and to render judgment thereon.

In this opinion the other justices concurred.

---

[15] In her brief, the plaintiff also raises two constitutional issues, arguing that, if this court concludes "that immunity under § 28-13 is solely determined by the existence of a civil preparedness emergency, the statute is unconstitutional as applied." Because we do not conclude that the application of § 28-13 immunity is solely determined by the existence of a civil preparedness emergency, we need not address the plaintiff's constitutional claims. See, e.g., *St. Paul Travelers Cos.* v. *Kuehl*, 299 Conn. 800, 813, 12 A.3d 852 (2011) (court has "duty to eschew unnecessarily deciding constitutional questions" [internal quotation marks omitted]).